[No. 50699–0. En Banc. February 27, 1986.]

HILLIS HOMES, INC., *Appellant,* v. PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY, *Respondent.*

*Edward Heavey,* for appellant.

*Williams, Novack & Hansen, Douglas F. Graham,* and *David R. Riley,* for respondent.

ANDERSEN, J.—

## FACTS OF CASE

Hillis Homes, Inc., challenges the validity of a general facilities charge exacted by Public Utility District No. 1 of Snohomish County (the District) upon new customers desiring to connect to the District's water system.

Following a trial to the court, the trial court concluded and held that the charge was authorized by statute, was not invalid as a tax, was not discriminatory or unreasonable, and did not constitute a deprivation of property without due process of law. We accepted direct review.[1]

The facts of the case as found by the trial court, and on the basis of which it concluded as it did, are set out in detail in the trial court's findings of fact. The nature of the assignments of error justifies these being quoted here:

> Defendant Public Utility District No. 1 of Snohomish County (hereinafter referred to as "the District") is a public utility district formed and operating pursuant to the laws of the State of Washington.

Finding of fact 1.

> Plaintiff Hillis Homes, Inc. is a Washington corporation, licensed to do business in the State of Washington, and is a licensed contractor.

---

[1]RAP 4.2(a)(4).

Finding of fact 2.

The District operates a water system in the Lake Stevens area of Snohomish County, Washington.

Finding of fact 3.

The water system was first constructed in 1946 primarily as a rural system. A charge was imposed upon new customers, which charge was similar to the General Facilities Charge being challenged by the plaintiff. The amount of the charge was $50.00 or $100.00, depending upon where the customer was located.

Construction of the water system was financed by a combination of water revenue bonds issued in 1946 for a thirty–year period and by the charge upon new customers. In addition, monies from the new customer charge were used to pay off the bond issue. A $100.00 charge upon new customers in 1946, adjusted based on the ratio of the Engineering News Record Construction Cost Index for the Seattle area for 1983 as compared to 1946, would be approximately $1,175. The District's bond counsel, Preston, Thorgrimson, Horowitz & Turner, issued a legal opinion in conjunction with that bond issue that the bonds were being issued in conformity with the applicable state laws of the State of Washington, Exhibit 16.

Finding of fact 4.

The water system has expanded over the years and in 1979 served 3,772 customers with a service area of approximately 27 square miles. The service area includes portions of Snohomish County in the vicinity of Lake Stevens and the City of Lake Stevens itself.

Finding of fact 5.

By 1979, as a result of rapid growth occurring in the water service area, the system had reached the limits of its transmission capacity. To serve new customers, it would be necessary to construct transmission and other improvements to the water system to provide additional capacity. Without such additional capacity, new customers could not be added.

Finding of fact 6.

In 1979 Snohomish County adopted a Comprehensive Plan for the Snohomish–Lake Stevens area. The plan projected a ten percent increase in population per year

for the water system's service area for the next several years.

Finding of fact 7.

In addition, in 1978 and 1979 new regulations were adopted by the State of Washington and a new ordinance was adopted by Snohomish County requiring the water system to provide minimum fireflow capacity for new customers; and in 1980, the City of Lake Stevens adopted a new ordinance requiring the water system to provide minimum fireflow capacity to new customers. Prior to that time no fireflow requirements were applicable to the water system. The water system in 1979 did not meet the minimum fireflow requirements of the new regulations and ordinances. If there were no growth (as defined by the ordinances and regulations) in the water system service area after 1979 or 1980, as the case may be, the fireflow requirements of the County, State, and City of Lake Stevens would not be applicable to the water system.

Finding of fact 8.

In 1979, the District undertook to develop a long range plan to identify facilities needed for the water system to serve anticipated new customers during the period 1980 to 1990, the cost of constructing those facilities, and recommendations for the funding of such facilities. Such a plan is known as a horizon year plan. The District hired the consulting firm of RH2 Engineering, a specialist in water systems analysis, to develop such a plan in conjunction with the District's staff. The plan was based upon population projections for the water service area for the period 1980 through 1990 contained in the County's Comprehensive Plan.

Finding of fact 9.

RH2 Engineering prepared a detailed computer model of all of the components of the existing water system. Based on the model, RH2 Engineering performed a water system analysis which yielded data demonstrating how the system operated under varying demand conditions. The demands of the anticipated new customers were programmed into the analysis. Based on this analysis, a series of projects were identified and prioritized. These projects would increase the capacity of the system to

enable the system to provide service to the anticipated new customers; and would improve reliability and fire-flow capability of the system. The cost of the improvements was approximately Six Million Dollars.

The horizon year plan was known as the "1990 Plan", and the improvements recommended in the plan are known as the "1990 improvements."

Finding of fact 10.

All of the 1990 improvements, except for one half of the capacity of the 12–inch main (which is equivalent to an 8–inch main) from Soper Hill Road to the Walker Hill Reservoir, were needed to provide service to new customers. An 8–inch main from Soper Hill Road to the Walker Hill Reservoir was needed, regardless of growth, to improve the reliability of the system to existing customers. The cost of an 8–inch main would have been approximately $150,000.

If no growth in the water system service area occurred after 1979, none of the improvements (except for an 8–inch main referred to above) would have been needed to provide service to the existing customers; and the existing system together with a new 8–inch main would provide adequate domestic service to the existing customers, and would be in compliance with all applicable codes and regulations. The new state and local minimum fireflow requirements would not apply to such a system.

Finding of fact 11.

The 1990 improvements resulted in the Washington Survey & Rating Bureau decreasing the fire insurance rating for the water system from a 7 to a 5. The decrease in the fire insurance rating caused a decrease in the individual fire insurance rates for all customers of the water system. The reason for the decrease in the fire insurance rating for the system was due to increased fireflows and improved reliability of the water system.

Finding of fact 12.

The General Facilities Charge was based upon the new customers' share of the 1990 projects. To establish the amount of the new customers' share, the District and its consultant made an allocation of the cost of each project between the new customers' share and the District's share as follows:

If the capacity of a project was needed solely to provide service to new customers, then the total cost of that project was allocated to the new customers' share. If the capacity of a project was needed solely to obtain a decrease in the fire insurance rating of the system, then the total cost of that project was allocated to the District's share. If the capacity of a project was needed both to provide service to new customers and to obtain a decrease in the fire insurance rating, a determination was made of the proportion of the capacity of that project needed to provide service to new customers, and the proportion of the capacity of the project needed to obtain a decrease in the fire insurance rating.

This allocation process is known as a "proportionate share analysis." It was based upon the criteria and data contained in the 1990 plan water system analysis, as well as the professional knowledge and expertise of RH2 Engineering and the District's staff. A mathematical formula for the allocation process was not developed, because it was not feasible to do so.

Finding of fact 13.

To establish the amount of the General Facilities Charge, the new customers' share for each project was added to obtain a total new customers' share for all projects. That total was then divided by the number of anticipated new customers to the water system during the decade 1980 to 1990, as projected by the County Comprehensive Plan for the water service area. That quotient yielded an average GFC.

Finding of fact 14.

Since different classes of customers place different demands upon the water system, the District and its consultants determined that a separate GFC should be developed for each class of customer, namely single family, multi–family, commercial/industrial, and other. The charge upon multi–family and commercial/industrial customers is based upon a comparison to an equivalent single family residential unit. The GFC for a new single family residential customer in 1980 was $900.00. Further, since the amount of the GFC was based upon the cost of projects in 1980, the District and its consultants determined that the GFC should be adjusted annually for the cost of inflation.

Finding of fact 15.

The District is forming a Utility Local Improvement District (U.L.I.D.) to provide water service to a new development in another part of Snohomish County as a separate water system. That system, known as the "May Creek System", will provide source, storage, transmission and distribution capacity to customers there. The preliminary assessment charge upon each residential lot in that system is approximately $2,700.00.

Finding of fact 16.

To provide the needed capacity to accommodate new customers, the District could have constructed a separate system in the Lake Stevens area to provide service to new customers. Based upon standards for establishing General Facilities Charges being promulgated by the American Waterworks Association, a national association of engineers, utility officials and others specializing in water systems, it is proper to consider the cost to new customers of constructing such a separate system in establishing the amount of the GFC. The new customers' share of such a separate system would be approximately $4,000.00 per new customer.

Finding of fact 17.

Although the water system itself was at the limit of its capacity in 1979, many components of the system such as reservoirs, pump stations and various transmissions lines were not at capacity. The improvements proposed in the 1990 Plan were designed to utilize the excess capacity in those components of the existing system to obtain the capacity needed to provide service to new customers. The new customers are not being charged for this excess capacity in establishing the GFC.

Finding of fact 18.

On December 4, 1979, the Commissioners of the District adopted Resolution No. 2335, which provided for the imposition of the GFC upon all new customers. The amount of the GFC was based upon the recommendations of the District staff and its consultant, RH2 Engineering, contained in the 1990 plan. A rate increase was also adopted to enable the District to pay for the system's share of the cost of the 1990 improvements.

Finding of fact 19.

If the cost of the 1990 projects was to be funded solely from rates, it would have been necessary to have approximately a 400 percent rate increase in 1980. The staff concluded that the rate payers would not accept such a rate increase.

Finding of fact 20.

Because the system was at capacity and because of the increased requirements for fireflows, it was necessary to construct certain projects immediately. Otherwise, the system lacked the capacity to serve new customers. To obtain funds to finance the construction of such projects, in May, 1980 the District adopted Resolution No. 2387 authorizing the issuance of 30–year revenue bonds in the amount of $2,390,000.

The resolution obligated the District to establish and fund special accounts and to collect rates and charges, at least equal to 1.25 times the amount of debt service. Debt service is to be paid from the net revenue of the water utility, so long as any of the bonds remained outstanding. GFC funds are defined in the bond resolution to be part of the District's revenues.

Finding of fact 21.

The cost of the 1990 improvements constructed during the years 1980 until 1983 were funded by the proceeds of a bond issue. GFC monies and system revenues are both used to make debt service payments on the bonds in proportion to the new customers' share (approximately 38%) and the system's share (approximately 62%), respectively, of the projects funded by the bond proceeds.

By 1983, all of the bond proceeds had been expended. 1990 projects constructed thereafter will be funded directly from GFC monies and system revenues in proportion to the new customers' share and the system's share, respectively, of each project.

Finding of fact 22.

The monies collected as General Facilities Charges are restricted to paying for the new customers' share of the 1990 improvements, either directly to fund the construction of the improvements or indirectly to pay for the new customers' share of the debt service of the revenue bonds.

Finding of fact 23.

As of the date of trial, approximately $490,000 has been collected in General Facilities Charges.

Finding of fact 24.

The improvements proposed as part of the 1990 Plan are a system–wide series of improvements to increase the capacity of the entire water system. They are not intended as local distribution improvements, and do not primarily function as local distribution improvements to benefit limited areas within the water system.

Finding of fact 25.

Plaintiff is the owner of a plat known as Catherine Creek. In July, 1978, the Lake Stevens Planning Commission and City Council granted preliminary approval for the plat, subject to certain conditions. It is in the City of Lake Stevens, one of the more remote locations of the water system both physically and hydraulically. As compared with other areas of the system, the cost to serve Catherine Creek is among the highest in the water system. In 1979 water pressures in the area of Catherine Creek were undependable; and fireflows available to the plat were substantially less than what is required under the new state regulations and county ordinance.

The plat was recorded on December 1, 1980. On August 26, 1982, plaintiff obtained a building permit to construct a house on one lot on the plat, and on October 13, 1982, plaintiff paid a GFC of $1090 for one single family lot in its plat. In 1982, the amount of the GFC for a single family customer was $1090.

Finding of fact 26.

The water system is an integrated system. What happens in one part of the system affects the operation of the system in other parts of the system. Since the system was at capacity in 1979 and improvements were needed to provide service to new customers and, further, since Catherine Creek was in a remote part of the system, every improvement did in fact benefit Catherine Creek to a greater or lesser degree.

Finding of fact 27.

Based upon a review of the procedures used by more than 400 utilities in setting General Facilities Charges, the standard practice of utilities in setting a GFC is to impose a uniform charge upon all new customers, or all

new customers in the same customer class. In none of those cases once a system of improvements has been determined has a GFC been fixed on the basis of benefits of projects, either individually or as *a* whole, to individual properties in the system.

Finding of fact 28.

A portion of rates of customers, including new customers, is used to pay the system's share of the debt service on the bonds issued to finance construction of some of the 1990 improvements. The basis for allocating a part of the cost of the 1990 improvements to the system share was that those improvements resulted in a decrease in the fire insurance rating for the system; and therefore, a decrease in the fire insurance rates for all customers of the system, both old and new. Further, to supply water to new customers, water will be transported through the existing system and the portion of the 1990 improvements allocated to the system. Therefore, all customers, both new and existing, have a stake in maintaining an adequately functioning system and have a stake in paying for the system's share of the 1990 improvements.

Finding of fact 29.

Three principal issues are raised by Hillis Homes' appeal.

## ISSUES

ISSUE ONE. Did the District have statutory authority to impose the general facilities charge that it did?

ISSUE TWO. Is the GFC an impermissible tax?

ISSUE THREE. Is the GFC discriminatory or unreasonable?

## DECISION

ISSUE ONE.

CONCLUSION. We conclude that the District did have the authority to exact a GFC, or connection fee, from new customers of its water supply system.

The District's authority in this regard stems from two statutes. One is RCW 54.16.030, which provides in part:

A [public utility] district may construct, purchase, condemn and purchase, acquire, add to, maintain, conduct, and operate water works . . . for the purpose of

furnishing the district, . . . with an ample supply of water for all purposes, public and private, . . . *with full and exclusive authority to sell and regulate and control the use, distribution, and price thereof.*

(Italics ours.) The other is RCW 54.24.080, which provides in part:

The commission of each [public utility] district which shall have revenue obligations outstanding shall have the power and shall be required to *establish, maintain, and collect rates or charges for . . . water and other services, facilities, and commodities sold, furnished, or supplied by the district . . .*

(Italics ours.)

No appellate decision in this jurisdiction has determined whether or not a public utility district may impose a connection charge based on these statutory provisions. Neither statute provides the express authority to do so, however,

[a] statute expressly granting general authority to achieve a lawful objective includes by implication the right to do such acts as may be reasonably necessary to achieve that objective.[2]

RCW 54.16.030 gives PUDs the authority to regulate and control the use and distribution of water provided by a PUD water system. RCW 54.24.080 directs that PUDs having revenue obligations outstanding shall collect rates and charges not only for water, but also for˜other services and facilities furnished by the district. In both instances, the imposition of a connection charge on new customers is a reasonably necessary means of effectuating the express powers granted. In opinions which we deem persuasive, other courts have also upheld the imposition of connection charges under similarly worded statutes.[3]

---

[2]*Foundation for the Handicapped v. Department of Social & Health Servs.*, 97 Wn.2d 691, 698–99, 648 P.2d 884 (1982), *cert. denied*, 459 U.S. 1146 (1983), quoting *Pacific Cy. v. Sherwood Pac., Inc.*, 17 Wn. App. 790, 794–95, 567 P.2d 642 (1977).

[3]*See, e.g., Englewood Water Dist. v. Halstead*, 432 So. 2d 172 (Fla. Dist. Ct.

ISSUE TWO.

CONCLUSION. Contrary to Hillis Homes' assertions, the charge imposed in this case is not a tax.

In *Teter v. Clark Cy.*, 104 Wn.2d 227, 239, 704 P.2d 1171 (1985), we recently reiterated the distinction between fees and taxes:

> In distinguishing between a "fee" and a "tax", we stated that if charges are intended to raise money, they are actually taxes. Conversely, if the charges are primarily tools of regulation, they are not taxes.

In *Teter,* the City of Vancouver and Clark County imposed charges upon property owners to finance flood control operations provided by a newly created water department. We noted that the charges were collected only to pay for necessary regulatory actions (such as runoff control ordinances, erosion control ordinances, and septic tank regulations) and were therefore fees rather than taxes.

Conversely, in *Hillis Homes, Inc. v. Snohomish Cy.*, 97 Wn.2d 804, 650 P.2d 193 (1982), Snohomish and San Juan Counties imposed charges on new residential developments as a prerequisite to plat approval and the charges were to pay for additional services (including schools, parks, roads and fire protection) necessitated by the new developments. Since the charges were primarily intended to raise revenue rather than regulate residential developments, they were held to be, in fact, unauthorized taxes, notwithstanding the Counties' classification of them as "fees".

The facts of the present case more closely resemble those in *Teter* than they do the facts in *Hillis Homes, Inc. v. Snohomish Cy.* The District has exacted a connection charge from its new water system customers as part of an overall plan to regulate the use of water. RCW 54.16.030 contemplates this type of regulatory scheme, in that it

App. 1983); *Carlton Santee Corp. v. Padre Dam Mun. Water Dist.*, 120 Cal. App. 3d 14, 174 Cal. Rptr. 413 (1981); *Amherst Builders Ass'n v. Amherst,* 61 Ohio St. 2d 345, 402 N.E.2d 1181 (1980); *Home Builders Ass'n v. Provo City,* 28 Utah 2d 402, 503 P.2d 451 (1972); *Associated Homebuilders of Greater East Bay, Inc. v. Livermore,* 56 Cal. 2d 847, 366 P.2d 448, 17 Cal. Rptr. 5 (1961).

expressly gives PUDs "full and exclusive authority to . . . regulate and control the use [and] distribution" of water. The fact that the connection charge necessarily imposes some burden on new customers does not make it an invalid tax. *Hillis Homes,* at 809.

In upholding a similar connection fee, the Florida Supreme Court in *Contractors & Builders Ass'n v. Dunedin,* 329 So. 2d 314, 318 (Fla. 1976) observed:

> *The municipality seeks to shift to the user expenses incurred on his account.* A private utility in the same circumstances would presumably do the same thing, in which event surely even petitioners would not suggest that the private corporation was attempting to levy a tax on its customers.

We agree.

ISSUE THREE.

CONCLUSION. As the facts found by the trial court establish, Hillis Homes' contention that the GFC is discriminatory and unreasonable because it was allegedly calculated without regard to the benefits received by the various customers within the District's water system is not tenable.

█ Hillis Homes bears the burden of proof on this issue since rates and charges are presumptively reasonable; and the rates will be sustained unless it appears, from all the circumstances, that they are excessive and disproportionate to the services rendered.[4]

Here, the District determined the amount of the various connection charges by using a "proportionate share analysis". In findings of fact supported by the record, the trial court found that the connection charges pay for only those improvements to the water system necessitated by the new customers, and hence will benefit them alone, and the remaining improvements are paid for by rate increases imposed on all customers.[5]

The District further classified the new customers into

---

[4]*Teter v. Clark Cy.,* 104 Wn.2d 227, 237, 704 P.2d 1171 (1985).

[5]Finding of fact 13.

subgroups, according to the expected demand they would place on the water system.[6] Thus, the charges for new single–family, multi–family, and commercial/industrial customers are computed separately. Although the charges were not individualized according to the benefits accruing to each specific customer,[7] this was not required. "[O]nly a *practical* basis for the rates is required, not mathematical precision."[8]

Different classes of customers may be charged different rates as long as the classifications themselves are reasonable.[9] Since the District's classifications are based upon the relative benefits received by each like group of customers, they are not unreasonable or discriminatory.

The trial court's findings of fact are supported by substantial evidence in the record. To the extent that the remaining issues raised are not answered by our foregoing discussion, they are deemed nonmeritorious.

Affirmed.

DOLLIVER, C.J., and UTTER, BRACHTENBACH, DORE, PEARSON, CALLOW, GOODLOE, and DURHAM, JJ., concur.

---

[6]Finding of fact 15.

[7]See finding of fact 28.

[8]*Teter,* at 238.

[9]*Silver Shores Mobile Home Park, Inc. v. Everett,* 87 Wn.2d 618, 623, 555 P.2d 993 (1976).