[No. 57920-2. En Banc. June 10, 1993.]

MARGOLA ASSOCIATES, ET AL, *Appellants*, v. THE CITY OF SEATTLE, *Respondent*.

*Richard B. Sanders,* for appellants.

*Mark H. Sidran, City Attorney,* and *Sandra M. Watson* and *Miriam Reed, Assistants,* for respondent.

*Richard M. Stephens, Ronald A. Zumbrun, Robin L. Rivett,* and *John M. Groen* on behalf of Pacific Legal Foundation, amicus curiae for appellants.

JOHNSON, J. — Apartment building owners in Seattle brought a class action challenging municipal ordinances that require the owners of buildings with more than one dwelling unit to register their buildings and to pay registration fees. They contend the ordinances create an unauthorized tax, are preempted by state law, and violate constitutional provisions regarding equal protection, impairment of contracts, takings, and substantive due process. The trial court upheld the ordinances on summary judgment.

We conclude factual issues exist precluding the issuance of judgment as a matter of law. In particular, material issues of fact preclude this court from deciding as a matter of law whether the registration fee created by the ordinance is a tax that Seattle lacks authority to impose. Accordingly, we reverse the summary judgment and remand for further fact-finding on the issue whether the registration fee is a tax or a regulatory fee. We reject certain other challenges to the ordinances.

I

BACKGROUND

The registration program challenged here represents Seattle's response to problems it was experiencing in properly enforcing the provisions of its housing code in the mid-1980's.

Historically, Seattle had inspected buildings for housing code violations only if it first received a complaint about a particular building. Seattle became concerned this complaint inspection process might be inadequate in identifying major housing code violations, and in 1987 it began a demonstration project of randomly inspecting apartment buildings in addition to its complaint inspection process. Approximately 10 percent of the buildings randomly inspected contained serious code violations, even though 80 percent of those buildings with violations had never before been assessed a violation under the complaint program.

Seattle concluded from this project that its complaint inspection procedures were not sufficiently identifying the buildings containing serious code violations. Accordingly, on September 18, 1989, just 2 months prior to the adoption of the registration ordinances, the City Council adopted a limited proactive inspection program, under which the Department of Construction and Land Use (DCLU) would identify and inspect the apartment buildings most likely to have code violations. Seattle City Resolution 28046. In the adopting resolution, the City Council acknowledged proactive inspection would involve added costs, and provided for funding with the following language:

> The Council requests the Executive to design and propose a fee-based funding mechanism to support the above-described proactive enforcement program and administrative costs of the fee structure, based on an estimated cost of $846,000 per year.
>
> The Executive has recommended that this fee structure also support costs associated with the complaint response code enforcement program; therefore, the precise amount of the fee should be determined during the 1990 Council Budget process.

Seattle City Resolution 28046; Clerk's Papers, at 289-90.

Pursuant to this resolution, the fee structure was to be set during the 1990 budget process in order to cover not only the costs of the proactive inspection program, but also at least some of the costs of the complaint inspection program.

In late November, as part of the 1990 budget process, Seattle first adopted the registration program here at issue. On November 27, 1989, Seattle adopted an ordinance we will refer to as the "registration ordinance". Seattle Municipal Code (SMC) 22.202.060. The registration ordinance applies to each "building containing two (2) or more housing units, where at least one (1) of such housing units is not occupied by the owner thereof". The owner of each building must annually obtain and post on the premises a certificate establishing the building has been registered with the City.

The registration ordinance authorizes the DCLU to charge an annual registration fee based on the number of housing units in the building, but the ordinance itself did not set the amount of the fee. Publicly assisted low income housing is exempt from the fee requirement. An owner who fails to register a building under this ordinance becomes subject to civil penalties and is precluded from evicting a tenant, even for just cause.

Four days later, Seattle passed a separate ordinance establishing the amount of the registration fee for the 1990 year. SMC 22.900.150(C). We will refer to this ordinance as the "fee ordinance". The fee ordinance set the fees according to the number of housing units in each building. Generally speaking, the greater the number of housing units, the lower the per unit registration fee. The annual fees ranged from $30.80 per unit for buildings with two housing units to $23.10 per unit for buildings with 50 or more housing units. Under this scheme, the average monthly fee would be approximately $2 to $2.50 per unit. Because the average rent for Seattle apartments was approximately $500 per month in 1990, the registration fee amounts to no more than one-half of 1 percent of the average apartment monthly rental rate.

Margola Associates and a number of other owners of Seattle apartment buildings sued the City. In their complaint, these plaintiffs (hereinafter referred to as Margola) challenged the municipal ordinances on a number of grounds: authority to tax; due process; equal protection; taking property without just compensation; impairment of contractual obligations; inverse condemnation; intentional interference with a business expectancy; and preemption by the Residential Landlord-Tenant Act of 1973. Margola's complaint requested a judgment declaring the ordinances invalid, an injunction against continued collection of the fee, damages, and attorney fees.

King County Superior Court certified the suit as a class action under CR 23(b)(2),[1] and established the plaintiff class as "all persons owning buildings in the City of Seattle which must be registered pursuant to the requirements of SMC 22.202.060." The court denied Margola's preliminary injunction motion.

Margola filed a motion for a partial summary judgment pursuing declaratory and injunctive relief; damages issues were withheld for a later decision. Seattle filed a cross motion for summary judgment, seeking dismissal of Margola's complaint. The Superior Court granted summary judgment to Seattle, denied Margola's motion for partial summary judgment, and dismissed the action with prejudice.

Margola obtained direct review of the summary judgment decisions in this court. Margola's appeal raises the following issues.

## II

## Issues

A. Is the registration fee a regulatory fee, which would be authorized under Seattle's police powers, or is it instead an unauthorized tax?

---

[1]The Superior Court concluded certification under CR 23(b)(3) was premature, and accordingly reserved any decision on that question pending resolution of the questions under CR 23(b)(2).

B. Alternatively, is the registration fee validly imposed pursuant to Seattle's licensing powers?

C. Does the registration ordinance unconstitutionally take private property without paying just compensation?

D. Do the registration and fee ordinances violate substantive due process?

E. Do the registration and fee ordinances violate equal protection?

F. Is the registration ordinance preempted by the Residential Landlord-Tenant Act of 1973?

G. Does the registration ordinance unconstitutionally impair contracts?

H. Is Margola entitled to attorney fees on appeal?

## III

## Analysis

In reviewing a summary judgment, an appellate court engages in the same analysis as the trial court. The appellate court determines whether genuine issues of material fact exist and whether the moving party is entitled to judgment as a matter of law. The appellate court considers the facts in the light most favorable to the nonmoving party. *Swanson v. Liquid Air Corp.*, 118 Wn.2d 512, 518, 826 P.2d 664 (1992); CR 56(c).

### A. Tax Versus Regulatory Fee

Margola argues the registration fee is a tax that Seattle lacks authority to impose. Seattle maintains its ordinances create a regulatory fee, not a tax, and that this type of fee is authorized under the City's general police powers.

The parties have properly framed this issue. If the registration fee is indeed regulatory, then Seattle has authority to impose that fee under its general police powers to regulate matters relating to health, safety, and welfare. Const. art. 11, § 11. Seattle also has direct legislative authority to *regulate* in order to maintain safe housing. RCW 35.22.280-(23). On the other hand, local governments may *tax* only pursuant to specific legislative or constitutional authority. *Hillis*

*Homes, Inc. v. Snohomish Cy.*, 97 Wn.2d 804, 805, 650 P.2d 193 (1982) (*Hillis* I); *San Telmo Assocs. v. Seattle*, 108 Wn.2d 20, 23, 735 P.2d 673 (1987). The authority to tax cannot be implied from a local government's general powers. *Hillis* I, 97 Wn.2d at 809. Here, no such direct taxing authority exists. Accordingly, Seattle's authority depends on whether the ordinances create a tax or a regulatory fee.

The test this court uses for distinguishing between taxes and regulatory fees is found in *Hillis* I, a case involving the characterization of fees assessed on real estate developers:

> Not all demands for payment made by a governmental body are taxes. We have pointed out that "if the primary purpose of legislation is regulation rather than raising revenue, the legislation cannot be classified as a tax even if a burden or charge is imposed." *Spokane v. Spokane Police Guild*, 87 Wn.2d 457, 461, 553 P.2d 1316 (1976). The characterization of the development fees will, therefore, turn on a determination of the primary purpose of the fees. If the fees are merely tools in the regulation of land subdivision, they are not taxes. If, on the other hand, the primary purpose of the fees is to raise money, the fees are not regulatory, but fiscal, and they are taxes.

*Hillis* I, 97 Wn.2d at 809. This standard has been applied in subsequent cases on this issue. *Teter v. Clark Cy.*, 104 Wn.2d 227, 238-39, 704 P.2d 1171 (1985); *Hillis Homes, Inc. v. PUD 1*, 105 Wn.2d 288, 299, 714 P.2d 1163 (1986) (*Hillis* II); *San Telmo*, 108 Wn.2d at 24. A quick summary of these cases follows.

At issue in *Hillis* I were ordinances from two counties imposing fees on developers to pay for additional services (solid waste disposal, parks, roads, fire protection, schools, sheriff's services) required by new developments. In one county, all fees were to be deposited in special accounts, and in both counties the fees were to be used only for capital projects in the geographical area where the payments were made. The court held the development fees were taxes, as the ordinances authorizing the fees make no provision for regulating subdivisions. Indeed, the court concluded the ordinances' *only* purpose was to raise money. *Hillis* I, 97 Wn.2d at 809-10.

In *Teter,* Vancouver and Clark County jointly set up a storm and surface water department to handle drainage problems in a particular basin. The department was established through a series of county resolutions and an interlocal agreement with the City. The County later adopted an ordinance setting charges for residents within the basin. This court noted both the ordinance and the County resolution referred to regulation and control of storm water. Moreover, the agency operating the drainage project issued a report indicating the charges were collected only in the amount necessary to pay for the regulatory actions (runoff control, erosion control and septic tank regulation). Thus, the primary purpose was regulatory, making the charges "tools of regulation" rather than taxes. *Teter,* 104 Wn.2d at 239.

In *Hillis* II, a public utility district imposed connection charges for a new water system as part of an overall plan to regulate the use of water. The connection fees could only be used to fund the construction of new improvements or to cover debt service on revenue bonds issued for the same purpose. The court noted the regulatory scheme is expressly authorized in RCW 54.16.030. The connection fee simply reflected a shifting to the user of expenses incurred by the system on the user's account. Thus, the charges were not taxes. *Hillis* II, 105 Wn.2d at 299-300.

In *San Telmo*, a Seattle ordinance placed conditions on the demolition of low income housing. If the landlord wanted to demolish low income housing and convert it to a nonresidential use, the landlord was required to give relocation notice and assistance to tenants, and to either (1) construct replacement housing, or (2) contribute to a fund that would do the same thing. Either of these options involved "a large expenditure of money for the public good". *San Telmo*, 108 Wn.2d at 23. The court noted the principles set out above in *Hillis* I, *Teter,* and *Hillis* II for fees charged by counties apply equally to fees charged by cities. After stating the test of *Hillis* I, the court added the following analysis:

> Quite simply, the municipal body cannot shift the social costs of development onto a developer under the guise of a regula-

tion. Such cost shifting is a tax, and absent specific legislative pronouncement, the tax is impermissible and invalid.

. . . [Here,] the payment the owner must make is not being used by the City to regulate the demolition of low income housing units. The City is instead shifting the public responsibility of providing such housing to a limited segment of the population. This shifting is a tax, and pursuant to RCW 82.02-.020, it cannot be allowed.

*San Telmo*, 108 Wn.2d at 24.[2]

Margola relies heavily on *Hillis* I in characterizing the registration charge as a tax. Margola observes the registration ordinances have no regulatory language at all, and the ordinances themselves give no indication of the purpose for which the money is to be used. Accordingly, Margola concludes the registration ordinances' only purpose is to raise money, and under *Hillis* I the charge imposed is a tax.[3]

We reject this argument. Under *Hillis* II, a court can look to the "overall plan" of regulation in construing the purpose of the challenged fee. Likewise, in *Teter*, this court looked beyond the legislation implementing the fee in order to determine the legislation's purpose. Even though the registration and fee ordinances themselves do not specifically refer to any "overall plan" of regulation or limit the use of revenues, the ordinances should not be viewed in isolation. As an initial matter, it must be recognized that the

---

[2]The analysis in *San Telmo* has since been questioned in *R/L Assocs., Inc. v. Seattle*, 113 Wn.2d 402, 780 P.2d 838 (1989), but not in a context affecting this case. The statute under consideration in *San Telmo* and *R/L Assocs.*, RCW 82.02.020, prohibited both taxes and fees from being imposed on development. Because both taxes and fees are prohibited in that context, *R/L Assocs.* indicated that interpretation of RCW 82.02.020 should not turn on a distinction between taxes and fees. *R/L Assocs.*, 113 Wn.2d at 408-09. In this case, however, RCW 82.02.020 is not at issue, and the distinction between taxes and fees is determinative.

[3]Margola also argues that the registration charge is a tax because it is "a fixed charge that automatically applies", citing to language from *Southwick, Inc. v. Lacey*, 58 Wn. App. 886, 795 P.2d 712 (1990). We reject this argument. Whether or not a "flat" fee is imposed does not enter into the *Hillis* I analysis. In fact, this court has already upheld a flat charge as a regulatory fee. *See Teter*, 104 Wn.2d at 238-39 ($15 annual fee for single family residences); *see also Stegriy v. King Cy. Bd. of Appeals*, 39 Wn. App. 346, 356-57, 693 P.2d 183 (1984) ($20 kennel license).

ordinances are codified in Seattle's municipal code at SMC 22.202.060 and SMC 22.900.150. A related provision in that code indicates the purpose of the registration fee and the other fees imposed in SMC 22.900 is to support the "permitting and permit inspection functions" of the Department of Construction and Land Use. SMC 22.900.020. In the context of this case, this provision indicates the housing registration fee is intended to support both the costs of registration ("permitting") and certain unspecified inspection functions.

This conclusion is confirmed by examination of Seattle City Resolution 28046, establishing the proactive inspection program. This resolution indicates the proactive inspection program is to be funded as follows:

> The Council requests the Executive to design and propose a fee-based funding mechanism to support the above-described proactive enforcement program and administrative costs of the fee structure, based on an estimated cost of $846,000 per year.
>
> The Executive has recommended that this fee structure also support costs associated with the complaint response code enforcement program; therefore, the precise amount of the fee should be determined during the 1990 Council Budget process.

The only fee structure this resolution could be referring to is contained in the registration and fee ordinances, adopted only 2 months later. This resolution also gives greater detail as to what the fee precisely covers; not only does the fee cover the costs of proactive inspections, but it also covers at least some of the costs of complaint inspections.

Even though we conclude the registration fee is imposed as part of an overall plan of regulation, this conclusion alone does not fully answer the tax versus regulatory fee question. Margola also argues the revenues to be generated by the registration fee greatly exceed the proper regulatory costs associated with those ordinances. If this is so, then the ordinances would have to be classified under the *Hillis* I test as being primarily fiscal rather than regulatory.

The record reveals many factual issues as to the amounts of these revenues and costs. Seattle estimated approximately $1.9 million would be raised by the registration program if landlords fully complied with its requirements. Seattle

reached this conclusion after estimating that 97,000 rental units existed in Seattle, of which 18,680 were exempt from the fee requirement, leaving only 78,320 units required to pay the fee. The record does not indicate the specifics of how Seattle calculated the $1.9 million revenue figure from this number.

Margola disagrees with these revenue calculations. Margola presented an affidavit from a Seattle real estate expert concluding over 115,000 rental units in Seattle were subject to registration. Even if this number does not take into account the 18,680 units Seattle maintains are exempt from paying the registration fee, this still leaves 96,320 units subject to the fee. If this figure is correct, then the registration program would raise revenues of between $2.2 million (based on the lowest possible fee of $23.10 per unit) and $3 million (based on the highest possible annual fee of $30.80 per unit), with the best estimate probably falling in the middle of this range, near $2.6 million.

The record does not provide much reason to believe one party's estimates of these numbers over the other party's. The DCLU based its number of housing units on records generated from two other city agencies, but in doing so its representative acknowledged he did not know exactly how many units existed in Seattle, and further admitted the records from other agencies contained differing approximations. Margola's affidavit does not explain how its estimate was calculated. Thus, this court has little basis for concluding whether the ordinances would raise $1.9 million, as Seattle maintains, or upwards of $2.5 million, as Margola maintains.

The estimates as to the costs covered by the registration fees raise even more troubling factual questions. The parties agree the costs associated with registering the apartment buildings are approximately $93,000 and the costs associated with the proactive inspection program are approximately $846,000. Both of these costs are properly covered by the registration fee as they are both costs attributable to regulating or inspecting apartment buildings. The confusion

in the record over the level of costs arises from the fact that registration fees are also to be used to fund at least some aspects of the complaint inspection program. The record does not directly reveal the costs of this complaint inspection program. Nor does the record indicate how much of the costs of this program are attributable to apartment buildings. The complaint inspection program encompasses violations of all buildings covered by Seattle's housing code, not just apartment buildings. Apartment building owners should not be held responsible for paying the inspection costs attributable to other types of buildings. *See Haugen v. Gleason*, 226 Or. 99, 104, 359 P.2d 108 (1961) (a governmentally imposed fee constitutes a tax rather than a regulatory fee when those paying the fee are not directly benefited by the services funded by the fee), *cited with approval in Hillis* I, 97 Wn.2d at 809-10.

Seattle attempts to downplay these factual questions by relying on an affidavit estimating the total costs of enforcing Seattle's building code at $2.7 million. These costs are stated as including both the complaint inspections and the proactive inspections. It is difficult to discern from this affidavit, however, whether other costs are also included in these figures. Even more importantly, no breakdown is given of the portion of costs attributable to apartment buildings. The closest the affidavit comes to answering this question is its statement that "the majority" of complaint-based inspections involve multifamily rental buildings. Even if this statement is true, almost 50 percent of the complaint-based inspections could relate to buildings that are not subject to the registration fee.

These figures reveal a real possibility that the revenues collected under the registration program are not reasonably related to the costs for which the fees are properly being collected. If in fact the revenues collected exceed the costs of the program, and if the revenues also cover the costs of complaint-based inspections of buildings other than apartments, then the revenues collected pursuant to the registration ordinances would have to be classified under *Hillis* I as

a tax rather than a fee. However, these outstanding factual questions also make it clear that genuine issues of material fact exist on the question of whether the revenues constitute a tax versus a regulatory fee, precluding the entry of judgment as a matter of law for either party. Therefore, we remand for further factfinding.

Margola has presented a number of other challenges to the registration and fee ordinances. Some of these challenges are premised on the conclusion that the registration fee constitutes a tax.[4] As the validity of this premise has not yet been established, we do not address these arguments.[5] We now turn to the other arguments raised by Margola in this appeal.

B. Seattle's Licensing Power

Seattle argues even if its registration fee is not authorized under its general police powers, the fee is authorized under its power to license for revenue purposes. Pursuant to RCW 35.22.280(32), Seattle and other first class cities are granted authority to issue licenses and to set the amount of license fees.

A license is generally defined as "a right granted by some authority to do an act which, without such license, would be unlawful." *Diamond Parking, Inc. v. Seattle*, 78 Wn.2d 778, 780, 479 P.2d 47 (1971); 9 E. McQuillin, *Municipal Corporations* § 26.01a n.1 (3d ed. 1986). Here, the registration ordinance in essence makes owning an unregistered building "unlawful" in the sense that a failure to register subjects the owner to civil penalties.

Nevertheless, we are hard put to decide on the briefing presented by the parties whether Seattle's ordinances repre-

---

[4]For example, Margola argues the registration program violates two state constitutional provisions relating to taxes: Const. art. 7, § 1 (amend. 81) (requiring that taxes be uniformly administered on the same class of property), and Const. art. 7, § 2 (amend. 79) (prohibiting annual property taxes that exceed 1 percent of the property's true and fair value).

[5]We also do not address Margola's argument that the trial court erred in refusing to strike the declaration submitted by Richard Richmire. Our analysis in this case does not rely on statements contained in the challenged portions of that declaration.

sent a proper application of its power to license for revenue purposes. Traditionally, the licensing power for revenue purposes is used with respect to businesses and occupations. *See, e.g., Tacoma v. Fiberchem, Inc.*, 44 Wn. App. 538, 722 P.2d 1357 (a municipal business and occupation tax authorized as licensing for revenue purposes), *review denied*, 107 Wn.2d 1008 (1986); *Seattle v. Campbell*, 27 Wn. App. 37, 611 P.2d 1347 (1980) (licensing of attorneys); *Pacific Tel. & Tel. Co. v. Seattle*, 172 Wash. 649, 21 P. 721 (1933) (a municipal business and occupation tax constituting licensing for revenue), *aff'd*, 291 U.S. 300, 78 L. Ed. 810, 54 S. Ct. 383 (1934); *Seattle v. King*, 74 Wash. 277, 133 P. 442 (1913) (licensing of delivery vehicles for hire); *Fleetwood v. Read*, 21 Wash. 547, 58 P. 665 (1899) (licensing of merchants using trading stamps). By contrast, the ordinances in this case apply more broadly to include vacant units or noncommercial buildings, such as a home with a mother-in-law unit. Thus, Seattle's ordinances go beyond the licensing of businesses and occupations.

Moreover, a violation of a traditional licensing ordinance leads to a revocation of the license and a cessation of the licensed activity, whereas here a failure to register actually forces continuation of the activity because a landlord who fails to register loses the ability to evict tenants for any reason.

The parties have inadequately argued whether these features of the registration ordinance preclude its characterization as a licensing measure for revenue purposes. We note this case is already being remanded for consideration of the tax/fee issue. Accordingly, we also remand the licensing issue for additional briefing and consideration below.

### C. Takings Clause

Margola argues the registration ordinance's restriction on a landlord's eviction power constitutes an unconstitutional taking of property and violates substantive due process. U.S. Const. amends. 5, 14; Const. art. 1, §§ 3, 16 (amend. 9).[6] Our

---

[6]Margola has not argued in this regard that the state constitution provides greater protection than is extended under the federal constitution. Nor has

framework for analyzing these issues was developed in *Presbytery of Seattle v. King Cy.*, 114 Wn.2d 320, 787 P.2d 907, *cert. denied*, 498 U.S. 911, 112 L. Ed. 2d 238, 111 S. Ct. 284 (1990). *See also Sintra, Inc. v. Seattle*, 119 Wn.2d 1, 829 P.2d 765, *cert. denied*, 121 L. Ed. 2d 598 (1992); *Robinson v. Seattle*, 119 Wn.2d 34, 830 P.2d 318, *cert. denied*, 121 L. Ed. 2d 598 (1992). We have subsequently revised that framework based on the United States Supreme Court's recent decision in *Lucas v. South Carolina Coastal Coun.*, ___ U.S. ___, 120 L. Ed. 2d 798, 112 S. Ct. 2886 (1992). This revised *Presbytery* analysis is outlined in *Guimont v. Clarke*, 121 Wn.2d 586, 598-604, 854 P.2d 1 (1993).

A land use regulation may be challenged either as an unconstitutional taking or as a violation of substantive due process. *Presbytery*, 114 Wn.2d at 329. Where a land use regulation is challenged on both takings and due process grounds, under our *Presbytery* framework, we begin by analyzing the takings issue. The court first asks two threshold questions to determine if a regulation is susceptible to a takings challenge. If the regulation passes the threshold inquiry, we proceed to a takings analysis. However, if the regulation survives the takings challenge, we then must determine whether the regulation violates substantive due process. *Presbytery*, 114 Wn.2d at 329-30. Of course, nothing precludes a party from challenging a land use regulation solely on either rather than on both constitutional grounds.

1. The Revised *Presbytery* Takings Analysis.

Under our revised *Presbytery* takings analysis, we begin by asking two threshold questions to determine whether further takings analysis is required. The court first asks whether the challenged regulation destroys one or more fundamental attributes of property ownership: including the right to possess, to

---

Margola briefed the *Gunwall* factors this court uses in determining whether to independently and more broadly interpret the state constitution. *See State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986). Accordingly, we will not engage in a separate state constitutional analysis. *Guimont v. Clarke*, 121 Wn.2d 586, 604, 854 P.2d 1 (1993); *World Wide Video, Inc. v. Tukwila*, 117 Wn.2d 382, 390, 816 P.2d 18 (1991), *cert. denied*, ___ U.S. ___, 118 L. Ed. 2d 391, 112 S. Ct. 1672 (1992).

exclude others, to dispose of property, or to make some economically viable use of property. *Guimont*, at 601-02; *see Presbytery*, 114 Wn.2d at 329-30. When a landowner alleges a regulation either compels the property owner to suffer a "physical invasion" of the property, or results in a "total taking" by denying all economically beneficial or productive use of the owner's land, fundamental attributes of property ownership may be implicated. *Guimont*, at 602; *see Lucas*, 120 L. Ed. 2d at 814. Therefore, the landowner must have the opportunity to prove at the outset under this first threshold inquiry that the regulation either physically "invades" his or her property or denies all economically viable use of the property resulting in a "total taking". *Guimont*, at 602. Because facial challenges to the economic impact of land use regulations also require the landowner to prove a regulation denies all economically viable use of his or her property, such facial challenges necessarily fall under the "total takings" category and are analyzed under the first *Presbytery* threshold inquiry. *Guimont*, at 602.

In the case of a "total taking" claim, if the landowner proves the regulation results in a "total taking" because it denies all economically viable use of the owner's land, the State then has the opportunity to rebut this claim by presenting evidence showing the owner's intended use of the property was already prohibited by existing state property or nuisance law. *Guimont*, at 602; *Lucas*, 120 L. Ed. 2d at 823. According to *Lucas*, the State "must identify background principles of nuisance and property law that prohibit the uses [the landowner] now intends in the circumstances in which the property is presently found". *Lucas*, 120 L. Ed. 2d at 823.

If the landowner proves a "total taking" or "physical invasion" has occurred, and if the State fails to rebut that claim, the owner is entitled to "categorical treatment" under *Lucas* in which the owner receives just compensation without case-specific inquiry into the public interest advanced in support of the regulation. *Lucas*, 120 L. Ed. 2d at 812-13. However, if the landowner alleges a "physical invasion" or "total taking" and fails to prove either has occurred, then there is no per se

constitutional taking requiring just compensation. *Guimont*, at 603.

If the landowner alleges less than a "physical invasion" or "total taking" and if a fundamental attribute of ownership is not otherwise implicated, the court proceeds to the second *Presbytery* threshold question. *Guimont*, at 603. Under the second question, the court asks whether the challenged regulation merely protects the public interest in health, safety, the environment or the fiscal integrity of an area, or whether the regulation "seeks less to prevent a harm than to impose on those regulated the requirement of providing an affirmative public benefit".[7] *Robinson*, 119 Wn.2d at 49; *Guimont*, at 603; *see Presbytery*, 114 Wn.2d at 329. If the regulation merely safeguards the public health, safety, and welfare, then no taking occurs, and the court proceeds with its substantive due process analysis in cases where the regulation has been challenged on both takings and due process grounds. However, if the regulation goes beyond preventing some real harm to the public which is directly caused by the prohibited use of the property and instead imposes on those regulated the requirement of providing an affirmative public benefit, or if the regulation infringes on a fundamental attribute of ownership, the court proceeds with its takings analysis. *Guimont*, at 603-04.

Under that analysis, the court examines whether the regulation substantially advances a legitimate state interest. *Guimont*, at 604. If it does not, the regulation results in a taking. *Presbytery*, 114 Wn.2d at 333. However, if the

[7]Several parties and the concurrence argue *Lucas* undermines this component of the *Presbytery* threshold analysis in which the court determines whether the predominant purpose of a regulation is to prevent a public harm rather than confer a public benefit. *See Lucas*, 120 L. Ed. 2d at 819. We decline to address their arguments, which go beyond what is necessary to decide the narrow facial takings challenge posed in this case. Moreover, it would be premature to begin dismantling our takings framework, carefully crafted in *Presbytery*, *Sintra*, and *Robinson*, without more definitive guidance on this issue from the United States Supreme Court. Therefore, we decline to further modify our takings framework at this time and reserve discussion of additional modifications, if any, until we are presented with a case that squarely addresses the issue.

regulation does advance a legitimate state interest, the court must balance this state interest against the regulation's adverse economic impact on the landowner to determine if a taking has occurred. *Guimont*, at 604. Under this balancing test, the court considers: (1) the regulation's economic impact on the property; (2) the extent of the regulation's interference with investment-backed expectations; and (3) the character of the government action. *Guimont*, at 604; *Presbytery*, 114 Wn.2d at 335-36. If the court determines a taking has occurred, then just compensation is mandated. *Guimont*, at 604; *Presbytery*, 114 Wn.2d at 336.

2. Application of the Revised *Presbytery* Analysis.

Under our revised *Presbytery* analysis, the court first asks whether the challenged regulation destroys one or more of the fundamental attributes of ownership. *Guimont*, at 601-02; *see Presbytery*, 114 Wn.2d at 329-30. In this case, Margola challenges Seattle's registration ordinance on its face. Because facial takings challenges to land use regulations may implicate fundamental attributes of ownership, they are evaluated at the outset under this first threshold inquiry. *Guimont*, at 602. To succeed in proving that a statute on its face effects a taking by regulating the uses that can be made of property, a landowner must show that the mere enactment of the statute denies the owner of all economically viable use of the property. *Guimont*, at 605; *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495, 94 L. Ed. 2d 472, 107 S. Ct. 1232 (1987). Facial challenges in which the court determines that a regulation denies all economically viable use of property "should prove to be a relatively rare occurrence". *Presbytery*, 114 Wn.2d at 335; *Lucas*, 120 L. Ed. 2d at 814.

Although Margola's complaint mounts a facial rather than "as applied" challenge, Margola has made no attempt to prove that the registration and fee ordinances have denied all economically viable use of his property. Given the small fee charged under the registration program, such a showing would be most difficult to make. Thus, Margola's facial challenge must fail insofar as the ordinances are challenged

as a regulation affecting the owners' economic use of their property.[8]

However, Margola also contends the registration ordinance results in a taking by "physical invasion" and destroys fundamental attributes of property ownership. The government must pay compensation when it physically occupies, or authorizes a third party to occupy, private property. *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831-32, 97 L. Ed. 2d 677, 107 S. Ct. 3141 (1987); *Guimont*, at 597 n.3. Margola argues a physical invasion exists because the ordinance's restriction on a landlord's eviction powers authorizes tenants to occupy the landlord's private property against the landlord's will. According to Margola, the ordinance results in tenants becoming permanent, unwelcome occupants of the landlord's land.

To prove the government's regulation results in a physical taking, the landowner must show the regulation "*requires* the landowner to submit to the physical occupation of [his or her] land". *Yee v. Escondido*, ___ U.S. ___, 118 L. Ed. 2d 153, 165, 112 S. Ct. 1522 (1992). When a regulation results in a physical occupation of private property, a compensable physical taking generally is found. *Guimont*, at 597-98; Settle, *Regulatory Taking Doctrine in Washington: Now You See It, Now You Don't*, 12 U. Puget Sound L. Rev. 339, 356, 389-90 (1989). In *Yee*, the United States Supreme Court held a rent control ordinance did not result in a physical taking of a mobile home park because it did not require the landowner to submit to physical occupation of the land. *Yee*, 118 L. Ed. 2d at 168. The Court stated:

[8]Margola also raises a facial challenge by alleging the ordinance does not substantially advance legitimate state interests. A regulation that does not substantially advance a legitimate state interest can effect a taking. *Presbytery*, 114 Wn.2d at 333. Such a facial challenge is ripe for review because it does not depend on the extent to which the owners are deprived of the economic use of their property or the extent to which they are compensated. *Yee v. Escondido*, ___ U.S. ___, 118 L. Ed. 2d 153, 169, 112 S. Ct. 1522 (1992). Margola's argument is without merit, however. Seattle has a legitimate governmental interest in ensuring compliance with its housing code, and the registration and fee ordinances substantially advance that interest by providing funding for those inspections.

> At least on the face of the regulatory scheme, neither the City nor the State compels petitioners, once they have rented their property to tenants, to continue doing so. To the contrary, the Mobilehome Residency Law provides that a park owner who wishes to change the use of his land may evict his tenants, albeit with six or twelve months notice. Put bluntly, no government has required any physical invasion of petitioners' property. Petitioners' tenants were invited by petitioners, not forced upon them by the government. While the "right to exclude" is doubtless, as petitioners assert, "one of the most essential sticks in the bundle of rights that are commonly characterized as property," we do not find that right to have been taken from petitioners on the mere face of the [ordinance].

(Citations omitted.) *Yee*, 118 L. Ed. 2d at 165 (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 62 L. Ed. 2d 332, 100 S. Ct. 383 (1979)). In *Yee*, the park owners voluntarily rented to tenants and could still evict them as long as they provided the required amount of notice. Thus, the Supreme Court concluded that the regulation merely regulated the *use* of the land, but did not amount to a per se physical taking. *Yee*, 118 L. Ed. 2d at 168.

Like *Yee*, Margola has voluntarily rented space to tenants. Likewise, Margola can continue to evict tenants as long as he pays a relatively small annual fee, just as the park owners in *Yee* could continue to evict as long as they gave notice to the tenants. Accordingly, the ordinance restricts, but does not destroy, Margola's right to exclude others from his property. As the Court in *Yee* noted: "A different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain *in perpetuity* from terminating a tenancy". (Italics ours.) *Yee*, 118 L. Ed. 2d at 166. Thus, the registration ordinance in this case does not destroy any fundamental attribute of property ownership and does not rise to the level of a physical taking.[9]

We conclude the Seattle ordinance on its face does not result in a regulatory or physical taking of property. There-

---

[9]Because no permanent physical occupation, or "exaction", occurred in this case, the substantial nexus test of *Nollan* does not apply. *Sintra*, 119 Wn.2d at 16 n.7.

fore, the trial court did not err in rejecting Margola's argument that the registration ordinance unconstitutionally takes its property without just compensation.

D. Substantive Due Process

Under *Presbytery*, the next issue is whether the legislation violates substantive due process. *Presbytery*, 114 Wn.2d at 330; *Robinson*, 119 Wn.2d at 51. In this regard, we ask three questions:

> (1) whether the regulation is aimed at achieving a legitimate public purpose; (2) whether it uses means that are reasonably necessary to achieve that purpose; and (3) whether it is unduly oppressive on the landowner.

*Presbytery*, 114 Wn.2d at 330.

The registration and fee ordinances survive scrutiny under these three questions. First, the purpose of the registration program is to ensure compliance with Seattle's housing code by funding inspections for housing code violations. This goal involves a legitimate public purpose.

As to the second question, Margola maintains Seattle could have used other means to ensure that landlords pay their registration fees, including the placing of a lien on the property. The mere existence of other means, however, does not establish that the means chosen were not reasonably necessary. Seattle responds that collection proceedings are wasteful and that the City's choice of means was reasonably related to the purpose. Margola has not satisfied its burden of proving the means were not reasonably necessary. *See Ford Motor Co. v. Barrett*, 115 Wn.2d 556, 562-63, 800 P.2d 367 (1990) (a party challenging a statute's constitutionality bears the burden of proving it unconstitutional beyond a reasonable doubt).

Margola's analysis of the third question consists of a single unsupported sentence concluding the ordinances are unduly oppressive. *Presbytery* requires a court to balance numerous factors in determining if a regulation is unduly oppressive. *Presbytery*, 114 Wn.2d at 331. Margola has not addressed how these factors apply in this case. We generally do not address

constitutional arguments that are not supported with adequate briefing. *See Spokane v. Taxpayers of Spokane*, 111 Wn.2d 91, 96, 758 P.2d 480 (1988); *Meyer v. UW*, 105 Wn.2d 847, 855, 719 P.2d 98 (1986). Moreover, we believe it would be difficult to show undue oppression from the small fee involved here.

Accordingly, we conclude the registration and fee ordinances do not violate substantive due process.

E. Equal Protection

Margola contends the registration and fee ordinances create improper classifications in violation of equal protection and due process. We follow the traditional approach of analyzing these issues as a matter of equal protection. *See* J. Nowak, R. Rotunda & J. Young, *Constitutional Law* § 11.4 (3d ed. 1986). Margola asserts the registration fee applies unequally because (1) it applies to rental housing, while it does not apply to owner-occupied housing, publicly assisted low income housing, commercial property, or vacant land, and (2) it is based on the number of housing units, not on value.

The Fourteenth Amendment to the federal constitution provides in relevant part: "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." When analyzing an equal protection claim, the first step is to determine the standard of review. *Foley v. Department of Fisheries*, 119 Wn.2d 783, 789, 837 P.2d 14 (1992); *Haberman v. WPPSS*, 109 Wn.2d 107, 139, 744 P.2d 1032, 750 P.2d 254 (1987), *appeal dismissed*, 488 U.S. 805, 102 L. Ed. 2d 15, 109 S. Ct. 35 (1988). The registration and fee ordinances at issue do not involve either a suspect classification, such as race, or a fundamental right. When examining legislation involving neither a suspect classification nor a fundamental right, an appellate court employs minimal scrutiny and applies a rational basis test. *Foley*, 119 Wn.2d at 789; *State v. Coria*, 120 Wn.2d 156, 169, 839 P.2d 890 (1992); *Omega Nat'l Ins. Co. v. Marquardt*, 115 Wn.2d 416, 431, 799 P.2d 235 (1990).

Under the rational basis test, "a statutory classification violates the equal protection clause only if it fails to rationally further a legitimate state interest". *Foley,* 119 Wn.2d at 789; *Burlington Northern R.R. v. Ford,* ___ U.S. ___, 119 L. Ed. 2d 432, 112 S. Ct. 2184, 2186 (1992); *see Coria,* 120 Wn.2d at 169. The court will uphold a legislative classification so long as "the relationship of the classification to its [legislative purpose] is not so attenuated as to render the distinction arbitrary or irrational". *Nordlinger v. Hahn,* ___ U.S. ___, 120 L. Ed. 2d 1, 112 S. Ct. 2326, 2332 (1992). Under this test, the challenging party can overcome the strong presumption of constitutionality only by showing the classification is "purely arbitrary". *Omega Nat'l Ins. Co.,* 115 Wn.2d at 431; *New Orleans v. Dukes,* 427 U.S. 297, 49 L. Ed. 2d 511, 96 S. Ct. 2513 (1976).

The classifications used in Seattle's ordinances are not purely arbitrary. The classifications further a legitimate governmental purpose: funding inspections for housing code violations, thereby ensuring Seattle maintains a supply of affordable housing. The primary classification, singling out certain multiunit buildings, simply identifies the types of buildings that Seattle could rationally decide involve the highest risk of containing housing code violations. Moreover, the classifications involved in setting the different fees merely apportion the burden of paying for housing inspections. Due to economies of scale, Seattle could rationally conclude that the more units a building has, the less it costs to inspect each unit.

We reject Margola's equal protection challenge.

F. Preemption by State Law

Margola argues Seattle's registration program is preempted by the Residential Landlord-Tenant Act of 1973, RCW 59.18 (RLTA). The registration ordinance prohibits a landlord from evicting a tenant unless the landlord has obtained a rental housing registration for that building. Margola argues this prohibition irreconcilably conflicts with the RLTA's provisions on unlawful detainer, which establish

procedures for evicting a tenant without regard to compliance with rental registration requirements.

This argument was rejected in *Kennedy v. Seattle*, 94 Wn.2d 376, 617 P.2d 713 (1980). *Kennedy* first set out the guiding principles regarding state law preemption:

> Preemption occurs when the legislature either expressly or by necessary implication states its intention to preempt the field, or when a state statute and local ordinance are in such direct conflict they cannot be reconciled.

(Citations omitted.) *Kennedy*, 94 Wn.2d at 383-84; *see Brown v. Yakima*, 116 Wn.2d 556, 559, 561, 807 P.2d 353 (1991).

*Kennedy* addressed whether state law regarding unlawful detainer actions preempts a city from "greatly [restricting] the ability of a moorage owner to evict the owner of a floating home from that moorage . . .." *Kennedy*, 94 Wn.2d at 380. The court reasoned as follows:

> Plaintiffs claim RCW 59.12, dealing with forcible entry and forcible and unlawful detainer, preempts the field. *See also* RCW 59.18, the Residential Landlord-Tenant Act of 1973. There is no preemption expressly or by implication, nor is there an irreconcilable conflict between the statutes and the ordinance. A defendant in an unlawful detainer action may assert any defenses available. RCW 59.16.030; 59.18.380. The ordinance does not raise further procedural barriers between landlord and tenant but simply represents another defense for the tenant.

*Kennedy*, 94 Wn.2d at 384.

The registration ordinance likewise creates an additional affirmative defense for a tenant: the tenant cannot be evicted unless the building has a rental housing registration.

Margola characterizes *Kennedy*'s analysis of the RLTA as dicta. This may be valid because it appears the plaintiffs in *Kennedy* argued only preemption under the related statutes of RCW 59.12. This court's analysis in *Kennedy*, however, suggests there is no valid distinction between the two sets of statutes, and the parties here have presented no reason why *Kennedy*'s holding should not also apply with respect to the RLTA. We reject Margola's preemption arguments.

G. Impairment of Contracts

Margola argues Seattle's registration program violates the contract clauses of the federal and state constitutions. *See* U.S. Const. art. 1, § 10 (states shall not pass laws impairing contracts); Const. art. 1, § 23 (no law impairing the obligation of contracts shall be passed). The two clauses are substantially similar and are given the same effect. *Washington Fed'n of State Employees v. State*, 101 Wn.2d 536, 539, 682 P.2d 869 (1984); *Birkenwald Distrib. Co. v. Heublein, Inc.*, 55 Wn. App. 1, 5, 776 P.2d 721 (1989).

The threshold question is "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 57 L. Ed. 2d 727, 98 S. Ct. 2716 (1978), *quoted in Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411, 74 L. Ed. 2d 569, 103 S. Ct. 697 (1983). As discussed in *Birkenwald Distrib. Co.*, impairment is substantial if the complaining party relied on the supplanted part of the contract, and contracting parties are generally deemed to have relied on existing state law pertaining to interpretation and enforcement. *Birkenwald Distrib. Co.*, 55 Wn. App. at 5 (construing United States Supreme Court decisions). Nevertheless, a party who enters into a contract regarding an activity "already regulated in the particular to which he now objects" is deemed to have contracted "subject to further legislation upon the same topic". *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 38, 84 L. Ed. 1061, 60 S. Ct. 792 (1940), *quoted in Energy Reserves Group*, 459 U.S. at 411.

Here, Seattle notes the right to evict a tenant was already regulated in state statutes, *see* RCW 59.12, 59.18, and this court had already held that municipalities may enact additional affirmative defenses to eviction. *See Kennedy*, 94 Wn.2d at 383-84. For these reasons, we hold that parties entering into residential leases do so subject to further legislation limiting the right to evict, at least to the extent the right is limited in this case.

Because the registration program does not substantially impair contractual relationships, we conclude it does not unconstitutionally impair obligations of contract.

H. Attorney Fees on Appeal

Margola asks for attorney fees on appeal under two statutes. The first statute is 42 U.S.C. § 1988, which in relevant part grants a court discretion to award attorney fees to a prevailing party in a 42 U.S.C. § 1983 action. In order to recover under section 1983, a plaintiff must show a federal statute or a provision of the federal constitution has been violated under color of state law. *Sintra*, 119 Wn.2d at 11; *Robinson*, 119 Wn.2d at 58. A local government may be held liable under section 1983 if the government's actions were undertaken pursuant to an official governmental policy or custom. *See Monell v. Department of Social Servs.*, 436 U.S. 658, 694, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978).

Here, Margola has challenged Seattle's actions as violating the federal constitutional provisions relating to equal protection, due process, takings, and impairment of contracts. We conclude above that Seattle has violated none of these provisions. Not having established any basis for recovery under section 1983, Margola is not entitled to fees under section 1988.

The second statute Margola cites for receiving attorney fees is RCW 8.25.075(3):

> A superior court rendering a judgment for the plaintiff awarding compensation for the taking or damaging of real property for public use without just compensation having first been made to the owner shall award or allow to such plaintiff costs including reasonable attorney fees and reasonable expert witness fees, but only if the judgment awarded to the plaintiff as a result of trial exceeds by ten percent or more the highest written offer of settlement submitted by the acquiring agency to the plaintiff at least thirty days prior to trial.

Margola has not established an entitlement to attorney fees under this statute. Margola has not received a judgment of compensation for the taking or damaging of real property.

Thus, we conclude Margola is not entitled to attorney fees for this appeal.

IV

CONCLUSION

We reverse the trial court's summary judgment order and remand for resolution of the factual questions underlying whether the registration fee is a tax or a regulatory fee.

ANDERSEN, C.J., and BRACHTENBACH, DOLLIVER, DURHAM, SMITH, and GUY, JJ., concur.

UTTER, J. (concurring) — I concur entirely in the judgment and opinion of the court, except with respect to the statement of our takings analysis in part III(C). For the reasons set forth in my concurring opinion in *Guimont v. Clarke*, 121 Wn.2d 586, 854 P.2d 1 (1993), I continue to believe that the takings analysis which we carefully and painstakingly constructed in *Orion Corp. v. State*, 109 Wn.2d 621, 747 P.2d 1062 (1987), *cert. denied*, 486 U.S. 1022, 100 L. Ed. 2d 227, 108 S. Ct. 1996 (1988) and *Presbytery of Seattle v. King Cy.*, 114 Wn.2d 320, 787 P.2d 907, *cert. denied*, 498 U.S. 911, 112 L. Ed. 2d 238, 111 S. Ct. 284 (1990) is good law.