
# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| ELLIOTT BAY MARINA, | ) | |
| | ) | No. 70453-2-I |
| Appellant, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| CITY OF SEATTLE, | ) | |
| a municipal corporation, | ) | UNPUBLISHED OPINION |
| | ) | |
| Respondent. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STATE OF WASHINGTON and KING | ) | |
| COUNTY,[1] | ) | |
| | ) | |
| Public Interested Parties | ) | FILED: October 27, 2014 |

SPEARMAN, C.J. — Elliott Bay Marina (EBM) appeals the trial court's summary judgment dismissal of its claims against the City of Seattle (the City). We reject EBM's argument that, as applied to EBM, the system rate charge assessed against City water customers is an unconstitutional tax and not a regulatory fee under Covell v. City of Seattle, 127 Wn.2d 874, 905 P.2d 324 (1995). We also conclude the doctrine of equitable estoppel precludes EBM's challenge to the fee. We affirm.

## FACTS

In 1958, King County voters approved the creation of the Municipality of Metropolitan Seattle (Metro) to address significant pollution in Lake Washington caused,

---

[1] Neither the State of Washington nor King County is a party to this appeal.

in part, by the dumping of raw sewage into the lake.[2] Pursuant to this mandate, Metro laid out a comprehensive system for the interception, conveyance and treatment of the region's sewage. In January 1961, the City and Metro entered into an "Agreement for Sewage Disposal" (Agreement). Clerk's Papers (CP) at 134-155.

The Agreement contained a number of recitals. Among them was the recognition that the public health, welfare and safety of the residents of the City and the County "require[d] the elimination of existing sources of water pollution and the preservation of the fresh and salt water resources of the area" and that meeting this goal required "certain major sewage disposal works be constructed and operated and that the cities and special districts within the metropolitan area dispose of their sewage in accordance with a comprehensive plan for the metropolitan area." CP at 134, 248.

Under the Agreement, the City agreed to deliver to Metro all of the sewage the City collected in its local system, and Metro agreed to treat and dispose of the City's sewage. The Agreement also provided that Metro acquire ownership of portions of the City's existing sewage system, including several trunk lines and other facilities, while the City retained ownership of the majority of its system and maintained responsibility for providing water to its residents. The City also agreed to pay Metro for treatment services according to a formula based on the City's residential and commercial customers' water consumption, Metro agreed that it would not accept sewage directly from anyone located within the city of Seattle without the City's written consent.

---

[2] In 1990 the structure of the Metro Council was found unconstitutional. See Cunningham v. Municipality of Metroploitan Seattle, 751 F.Supp 885 (W.D. Wash. 1990) and 751 F.Supp 899 (W.D. Wash 1990). In 1994, King County (County), under the authority of RCW 36.56.010, assumed the rights, powers, functions, and obligations of Metro. Hereinafter we use "County" and "Metro" interchangeably.

The City's water customers, including EBM, pay a single rate to the City that covers the combined costs of the City and County sewage services. The charge is based on the measured volume of water consumed on the premises, i.e., the "wastewater volume charge." SMC 21.28.040A.[3] The wastewater volume charge is the sum of two components, the "treatment rate,"[4] and the "system rate."[5] The treatment rate is the amount paid to the County for treatment services and is the larger of the two components. The system rate covers costs associated with operating the City's wastewater utility including, among other things, taxes, administrative costs, customer service, meter reading, billing, investments in technology, training, inspections and enforcement of the Side Sewer Code.[6] Id. SMC 21.28.090B specifically provides as to commercial customers that discharge of wastewater "to points other than the City sewer system shall not be cause for adjustment or reduction of the wastewater charge or rate."

In 1991, EBM negotiated with the City to open a privately owned, public marina at the base of Magnolia Bluff. As a part of the negotiations, EBM agreed to retrofit the sewage lines then serving the area, which had been wrought with problems.

---

[3] SMC 21.28.040A provides in pertinent part:

> There is hereby imposed upon all premises for which Seattle Public Utilities provides wastewater services and on which water is consumed a wastewater volume charge for wastewater services. The wastewater volume charge shall be calculated in accordance with this SMC Chapter 21.28 and shall be based on the measured volume of water from all sources consumed on the premises . . . .

[4] The treatment rate is "the rate required to pay the wastewater share of 'treatment cost' which is the cost of wastewater treatment, interception and disposal services and any associated costs required to meet Drainage and Wastewater Fund financial policies," or the amount required to compensate Metro. SMC 21.28.040.B.1.

[5] The system rate is "the rate required to pay the cost of carrying and discharging all wastewater and any wastewater funded-share of stormwater into the City sewerage system, as presently maintained and operated and as may be added to, improved and extended." SMC 21.28.040B.2.

[6] See, SMC ch. 21.16.

Specifically, EBM agreed to relocate the South Magnolia trunk line—a large sewage line owned by Metro, which transports waste to Metro's West Point treatment facility—away from the base of the Magnolia Bluff and through EBM's property. EBM also agreed to add approximately thirty feet of landfill along the base of the Magnolia Bluff. These combined efforts would have the effect of stabilizing Magnolia Bluff, which was prone to landslides, and protecting the South Magnolia trunk line from breakage.[7]

Also as a part of these negotiations, the City granted EBM permission to connect its wastewater system directly to the new South Magnolia trunk line. As a result, all of the EBM's wastewater discharges into the Metro trunk line, where it is then transferred directly to Metro's West Point treatment facility. None of EBM's wastewater enters the City's local sewage lines.

Although EBM does not discharge waste into the City's sewage lines, it has utilized the City's sewage-related services in other ways. Prior to EBM connecting to the system, the City reviewed EBM's sewer plan and facilitated EBM's connection by controlling flows at its pump station. And, as one of the City's commercial customers, under SMC 21.28.090A, EBM has purchased and installed submeters to reduce its wastewater charges by deducting the quantities of metered water that are delivered to boats and other watercraft and do not enter the sewer system. The City's wastewater customer service representatives worked with EBM to install appropriate submeters and routinely visit EBM's facilities to read the meters. EBM is now served by an array of

_____

[7] The original South Magnolia trunk line was located at the base of an active "rotational block" landslide on Magnolia Bluff. Prior to remediation by EBM, landslides caused line breakages in 1973, 1974, three times in 1982, and twice in 1983, each time spilling raw sewage into Elliott Bay. The original trunk line was also difficult to maintain due to beach access and tidal restrictions.

about a dozen submeters, each of which requires the City's staff to make monthly readings.[8]

Beginning in 2009, the billing statement the City sent to its customers, including EBM, showed a breakdown of the wastewater volume charge into is two components, the treatment rate and the system rate. Prior to that, the billing statement showed only the wastewater volume charge. In 2012, EBM filed a complaint against the City for declaratory judgment and injunctive relief. It claimed that, as applied to EBM, the system rate is an unconstitutional tax. The City denied the allegation. The parties filed cross-motions for summary judgment.

The trial court granted the City's motion. EBM appeals.

## DISCUSSION

### Standard of Review

This court reviews summary judgment de novo, engaging in the same inquiry as the trial court. Highline Sch. Dist. No. 401, King County v. Port of Seattle, 87 Wn.2d 6, 15, 548 P.2d 1085 (1976). Summary judgment is proper only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Bostain v. Food Express, 159 Wn.2d 700, 708, 153 P.3d 846 (2007). Facts and reasonable inferences therefrom are viewed most favorably to the nonmoving party. Id. Summary judgment is proper if reasonable minds could reach but one conclusion from the evidence presented. Id.

---

[8] EBM was required to purchase the submeters and pay a surcharge to the City for the initial review, inspections, and billing initiation.

Covell Analysis

A city has broad power to impose a regulatory fee, but imposition of a tax must be authorized by statute and our constitution. Lane v. City of Seattle, 164 Wn.2d 875, 882, 194 P.3d 977 (2008) (citing Okeson v. City of Seattle, 150 Wn.2d 540, 550, 78 P.3d 1279 (2003)). In determining whether a charge is an unconstitutional tax or a valid regulatory fee, Washington courts apply the three-part test set forth in Covell, 127 Wn.2d 874. First, we consider whether the primary purpose of the charge is to collect revenue to finance broad-based public improvements or, instead, a fee to "regulate" the use of a particular service provided or burden imposed. Arborwood Idaho, L.L.C. v. City of Kennewick, 151 Wn.2d 359, 371, 89 P.3d 217 (2004). If the former, the charge is a tax. If the latter, the charge may be a permissible regulatory tool. Id. Second, we determine whether the money raised is allocated only to the authorized regulatory purpose. Third, we ascertain whether a direct relationship exists between the rate charged and either a service received by the fee payers or a burden to which they contribute. Covell, 127 Wn. 2d at 879; Lane, 164 Wn.2d at 882; Samis Land Co. v. City of Soap Lake, 143 Wn.2d 798, 806, 23 P.3d 477 (2001).

The parties dispute whether, under Covell, the system rate is a tax or a regulatory fee. The dispute hinges on EBM's assertion that the City and the County maintain two separate and independent sewage systems based on their separate ownership of the sewage system components. Because it is undisputed that EBM connects directly to a sewer line owned and operated by the County, EBM contends that paying the system rate requires it to fund operation of the City's sewer system, from which it neither benefits nor burdens. Thus, according to EBM, the system rate is a tax.

6

The City disputes EBM's assertion that the City and the County operate separate sewage systems. It argues that while the City and the County own and operate different parts of the sewage system, the system itself is an integrated whole in which neither part could function without the other. Thus, according to the City, it is immaterial whether EBM connects to a City line or directly to a County line because in either case, EBM benefits from and burdens the system as a whole. In addition, the City points to SMC 21.28.090B, which specifically provides that connection to a point other than the City sewer line "shall not be cause for adjustment or reduction of the wastewater charge or rate."

We think it plain that the sewage system operated by the City and the County forms an integrated whole, regardless that separate parts are owned by each entity. As the City notes, neither the City nor the County alone can serve the goals stated in the 1961 Agreement. The Agreement contemplates a single comprehensive system that includes both City and County-owned facilities. Although the County largely owns the wastewater treatment facilities and the larger trunk lines, while the City owns the facilities that gather the sewage and wastewater, as the City points out, neither part could function without the other and each part would be useless without the other. By any measure, the two parts operate as a single entity.

When the wastewater system is viewed as a whole, it is evident that EBM's claim that the system rate is a tax fails. EBM argues the system rate is a tax because it does not pass Covell's "primary purpose" test. It argues the primary purpose of the system rate is to raise revenue to finance the City's sewer system and that it does nothing to

7

regulate users not directly connected to City-owned pipes. The argument is without merit.

Whether a charge raises revenue is not dispositive of whether it is a tax or a fee because both taxes and fees raise revenue. Storedahl Properties, LLC v. Clark County, 143 Wn. App. 489, 501, 178 P.3d 377 (2008). The fundamental consideration is the purpose for which the money is raised. While a tax raises revenue for the general public welfare, a fee raises money to pay for or regulate a service that those who pay will enjoy, or a burden that those who pay have created. Id. Here, because the sewage system is an integrated, comprehensive system, it does not matter whether EBM connects to a City or County owned line. In either case, EBM burdens the system as a whole. In addition, EBM does not dispute that it benefits from a number of other services the City provides, such as, water service, meter reading, billing and customer service, all of which have associated administrative costs. The system rate also serves to regulate these uses of the system.

The second Covell factor requires that regulatory fees be "used to regulate the entity or activity being assessed." (Emphasis added). Covell, 127 Wn.2d at 886; Samis, 143 Wn.2d at 810. EBM argues that because it is not connected to a City owned sewer line, the system rate component of the wastewater volume charge does not serve to regulate the disposal of the sewage it creates. We disagree. As explained above, because EBM discharges sewage into a single, integrated sewage system and utilizes services provided by the City, the waste water volume charge, including the system rate, serves to regulate this activity.

8

The third Covell factor asks whether a direct relationship exists between the rate charged and either a service received by the fee payers or a burden to which they contribute. Covell, 127 Wn.2d at 879. A charge may be deemed a regulatory fee even though the charge is not individualized according to the benefit accruing to each fee payer or the burden produced by the fee payer. Id. "[A]s long as a direct relationship is present, 'only a practical basis for the rates is required, not mathematical precision.'" Samis Land Co., 143 Wn.2d at 811 (quoting Teter v. Clark County, 104 Wn.2d 227, 238, 704 P.2d 477 (1985)). Here, there is a direct relationship between the benefit received and burden created by EBM. Nothing more is required. It is undisputed that EBM contributes wastewater to the sewage system. In addition, EBM has availed itself of several services ancillary to sewage and wastewater disposal, which are provided by the City to its customers and are funded by the system rate.[9] For example, the City's employees reviewed EBM's sewer plan prior to its remediation of the South Magnolia trunk line and facilitated EBM's connection to the South Magnolia trunk line by controlling flows at the pump station. EBM also worked with the City's customer service representatives to install submeters, which are routinely visited by the City's field employees. EBM also benefits from the City's billing service.

EBM minimizes its use of the available services from the City. EBM maintains that this use of services does not constitute a benefit or burden because EBM was required to pay a surcharge to the City for initial review, inspection, and billing initiation. It also points out that the authority to install submeters is based on the original 1961

---

[9] The City did not brief this argument, but the record supports it and the City raised the issue at oral argument. In its briefing and at oral argument, EBM disputes the proposition that its use of the City's services detailed in this section constitutes a "benefit" within the meaning of Covell.

9

Agreement and SMC 21.28.090.A.1,[10] and that EBM was required to purchase the submeters. But, the source of authority to install submeters and the fact that their cost was passed along to EBM does not diminish the fact that EBM solicited City employees to facilitate the installation and service of those submeters. Furthermore, the extent to which EBM makes use of these available services is immaterial. It is not necessary that the fee be adjusted according to each payer's individualized circumstance. Hillis Homes v. PUD, 105 Wn.2d 288, 301, 714 P.2d 1163 (1986). "Although the charges were not individualized according to the benefits accruing to each specific customer, this was not required." (Footnote omitted).

EBM relies primarily on Samis Land Co., 143 Wn.2d 798. In that case, the City of Soap Lake enacted an ordinance that imposed a flat-rate $60 annual "standby" charge on any "'vacant, unimproved land which shall abut a line providing water service or sewer service but have no connection thereto.'" Id. at 802. Samis owned such a piece of land and for years paid the annual charge. But in 1996, it filed suit seeking, among other things, a refund of the charges paid, alleging that the charge was an unconstitutional property tax.

The Supreme Court agreed, concluding the charge failed the Covell test. As to the first factor, Soap Lake conceded the "'standby charge makes no attempt to regulate

_____

[10] SMC 21.28.090 provides in relevant part:

A.   It is the intent of this section to charge commercial customers for water that should enter the sewer system. Wastewater charges shall be based on the metered water delivered to the premises except as noted below:

   1.   Water metered exclusively for fire service, sprinkling, irrigation or delivery of water to ships shall not be subject to any wastewater charge or rate.

10

the use of water or sewer services'" and that the '"primary purpose of the ... standby charge is to generate revenues.'" Id. at 807-08. As to the second factor, Soap Lake initially admitted that '"[t]he money collected through the standby charge is not allocated exclusively to a regulatory purpose.'" Id. at 810. Although Soap Lake later tried to retract that admission, the court found "the only entities being assessed the charge in question are properties subject to no identifiable utility-related 'regulatory activity.'" Id. As to the third factor, the court noted that "the properties at issue here by definition have no relationship to the City's water service" and because "the lands at issue are uninhabited properties that generate no sewage of any kind [they] ... do not otherwise burden the City's sewer or water systems." Id. at 813. In addition, Soap Lake conceded that '"[l]iability for the standby charge does not arise from [Samis'] use of a city service.'" Id.

EBM argues it is similarly situated to the property owner in Samis because it is unconnected to a sewer line owned by the City, just as Samis was unconnected to Soap Lake's water system. But the similarity ends there and as we have explained, in the context of this case, that similarity is immaterial. In Samis it was virtually undisputed that, not only was Samis unconnected to the water system, the contested charge was unrelated to any activity in which the property owner was engaged. Here, it is undisputed that EBM burdens the sewer system. The issue is whether there are two separate systems or a single, comprehensive system. Because we conclude the latter, it does not matter that EBM directly connects to a County owned sewer line. Moreover, EBM does not contend that it does not utilize services supported by the system rate, it only disputes the amount and extent of that use. But as we have stated, the City is not required to individualize the fee charged according to the level of use or the specific

benefits accruing to a particular payer. Hillis Homes, 105 Wn.2d at 301. We conclude the system rate is a permissible regulatory fee.

Equitable Estoppel

The City also argues that EBM should be equitably estopped from claiming it should pay a reduced rate based on the fact that it connects to a County owned sewer line. The elements of equitable estoppel are: 1) an admission, statement or act inconsistent with a claim afterwards asserted; 2) action by another in reasonable reliance upon that act, statement or admission; and 3) injury to the relying party from allowing the first party to contradict or repudiate the prior act, statement or admission. Lybbert v. Grant County, 141 Wn.2d 29, 35, 1 P.3d 1124 (2000). The proponent must prove each element by clear, cogent and convincing evidence. Id., citing Berschauer/Phillips Const. Co. v. Seattle Sch. Dist. No. 1, 124 Wn.2d 816, 831, 881 P.2d 986 (1994).

The City contends the undisputed evidence satisfies its burden of proof as to each element. The City points out that SMC 21.28.090B was in effect when it authorized EBM to connect to the County owned line. That ordinance, which is still in effect, provided that "[d]irect discharge of wastewater...to points other than the City sewer system shall not be cause for adjustment or reduction of the wastewater charge or rate." The City claims that when EBM sought and was granted permission to connect to a County-owned line, EBM was aware of the ordinance, but made no claim that it was entitled to any adjustment or reduction based on its discharge into other than a City owned line. The City contends it relied on EBM's failure to make such a claim when it granted permission to connect to the County-owned line and, but for EBM's silence, it

12

would not have so agreed. Lastly, the City claims that it will suffer a loss of revenue if the reduction is allowed.

EBM does not contest the City's assertions. Instead, EBM argues that equitable estoppel fails as a defense to its lawsuit for two reasons. First, EBM points out that because this action was brought to recover illegal taxes it is treated as action under an implied contract. Robinson v. Seattle, 119 Wn.2d 34, 83-84, 830 P.2d 318 (1992) (suits seeking tax refunds arise upon an implied contract because they "'are actions arising out of implied liabilities to repay money unlawfully received . . . .'" (quoting Hart v. Clark Cy., 52 Wn. App. 113, 115-16, 758 P.2d 515 (1988)). Thus, EBM argues equitable estoppel is not available as a defense because the implied contract at issue is an illegal one. Vedder v. Spellman, 78 Wn.2d 834, 837, 480 P.2d 207 (1971). EBM also argues that even if equitable estoppel were available as a defense, the City cannot establish that EBM made an inconsistent admission, statement, or act because "payment under protest" is not required for a refund of an illegal tax. Carrillo v. City of Ocean Shores, 122 Wn. App. 592, 610-12, 94 P.3d 961 (2004).

EBM's first argument fails because the implied contract theory upon which it relies requires some liability on the part of the City "to repay money unlawfully received." Robinson, 119 Wn.2d at 84. The uncontested evidence is to the contrary. It would have been lawful for the City to refuse permission for EBM to connect with the County-owned line. In that event, it seems apparent that EBM would have been required to connect to a City-owned line and lawfully required to pay the full amount of the wastewater volume charge, including the system rate. Instead, the City permitted EBM to connect to the County owned line based on the understanding that EBM would not seek a reduction or

13

adjustment in the full amount of the wastewater volume charge. Because the City could have lawfully sought the full amount in the first instance, there is nothing unlawful about receiving it pursuant to its implied contract with EBM.

EBM's second argument, that the City cannot prove an inconsistent admission statement or act, also fails. EBM's reliance on Carrillo is misplaced. In Carrillo, the City of Ocean Shores enacted two ordinances which imposed a charge for undeveloped lots that were unconnected to the City's water or sewer lines. Because the lots were unconnected, the Carrillo court concluded that the charges served no regulatory purpose and were in fact an unconstitutional tax. Id. at 608. The City argued that the unlawful tax money paid by the property owners was non-refundable based on, among other reasons, the doctrine of equitable estoppel. The Carrillo court rejected the argument. It held that payment under protest of a tax is not required for a refund of an illegal tax, unless required by statute. Id. at 611. Because the ordinances in question did not require payment to be made under protest to preserve objection, "the owners' payment of the charge was not inconsistent with their current claim that the charge itself is invalid." Therefore the City was unable to prove one of the elements of equitable estoppel. Carrillo is of no help to EBM because, unlike the plaintiff there, EBM did not simply pay an alleged illegal tax without protest. Rather EBM sought and obtained permission from the City to do something which it was not otherwise entitled to do: connect directly to a County-owned sewer line.

EBM does not dispute that the City's evidence establishes each element of equitable estoppel by clear, cogent and convincing evidence; we are likewise satisfied that it does. EBM was aware of and did not contest the ordinance that precluded a

reduction or adjustment in the wastewater volume charge. The current action for a reduction is inconsistent with EBM's silence at the time the request was made and granted.[11] The City reasonably relied on EBM's silence because it would not have otherwise granted EBM's request. And allowing EBM to proceed with the action at this juncture would cause the City financial injury.

We conclude that under the Covell test, the system rate component of the wastewater volume charge is a permissible regulatory fee and that, in any event, EBM is equitably estopped from challenging the fee.

Affirmed.

Specimen, C.J.

WE CONCUR:

---

[11] Estoppel may arise under certain circumstances from silence or inaction as well as from words or actions. Board of Regents v. Seattle, 108 Wn.2d 545, 741 P.2d 11 (1987). Silence is an inconsistent act for purposes of estoppel, when there is knowledge of the facts and when honesty and fair dealing demand that the party asserting a right speak. Id. at 553-54, citing Huff v. Northern Pac. Ry. Co., 38 Wn.2d 103, 114-15, 228 P.2d 121 (1951) and 28 Am. Jur. 2d Estoppel and Waiver § 53.