# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| VIKING JV, LLC, | No. 55371-6-II |
| Appellant/Cross-Respondent, | |
| v. | |
| CITY OF PUYALLUP, | UNPUBLISHED OPINION |
| Respondent/Cross-Appellant. | |

GLASGOW, C.J.—Viking JV LLC is constructing an approximately 450,000 square foot commercial warehouse within the City of Puyallup and adding more than 20 acres of impervious surface near the Puyallup River. Under RCW 35.92.025, cities may charge property owners a "reasonable connection charge" to connect to the City's storm water utility system "in order that such property owners shall bear their equitable share of the cost of such system." The City assessed Viking an approximately $997,000 system development charge to connect to its storm water system based on the amount of impervious surface the project would create. Viking paid this charge under protest, and it was reviewed by the City's public works director, hearing examiner, and appellate examiner.

Viking challenges the system development charge as unreasonable and inequitable in light of the Viking project's unique characteristics and its contribution of infrastructure to the City's system. Viking further challenges the City's two-tiered hearing examiner review process and asks that we review the initial hearing examiner's decision, rather than the appellate examiner's decision.

No. 55371-6-II

Following this court's recent opinion in *Viking JV, LLC v. City of Puyallup* (*Viking* I), No. 55421-6-II, slip op. at 16 (Wash. Ct. App. May 10, 2022), https://www.courts.wa.gov/opinions/ pdf/D2%2055421-6-II%20Published%20Opinion.pdf, we again hold that the City's two-tiered hearing examiner review process is valid and that the appellate examiner's decision constitutes the City's final reviewable land use decision under the Land Use Petition Act (LUPA), chapter 36.70C RCW. We also follow Division One's recent decision in *Westridge-Issaquah II, LP v. City of Issaquah*, 20 Wn. App. 2d 344, 365, 500 P.3d 157 (2021), and hold that a party may not bring an individualized challenge to connection charges assessed under RCW 35.92.025. Even if Viking could bring such a challenge, the appellate examiner properly found no basis for an equitable adjustment in this case because Viking's circumstances are not particularly unique and Viking will benefit from the City's storm water infrastructure.

We therefore affirm the superior court's ruling that a system development charge was warranted, reverse its ruling that a reduced charge was appropriate due to unique circumstances, and reinstate the full system development charge of $997,280, affirming the appellate examiner.

FACTS

Viking is constructing an approximately 450,000 square foot commercial warehouse at the edge of the City of Puyallup. The warehouse is designed to accommodate numerous trucks and meet the City's standards for a trucking facility. It will add more than 20 acres of impervious surface to the property.

The development is located in a storm water drainage basin outside of the six other drainage basins that the City uses for planning purposes. Prior to development, the area was primarily pervious farmland and relatively flat, so most storm water runoff would simply drain into the soil.

Within the basin, there were no major drainage facilities or water quality facilities, but there were some roads, as well as ditches and culverts to help manage runoff. There was one 18-inch outfall pipe that discharged excess storm water into the Puyallup River.

As part of the development process, Viking was required to address the runoff its development would create and to ensure that preexisting flows of runoff were accommodated, or at least not interrupted. If Viking were to construct a trunk line, or main line, to serve only its own project, the line would need to be approximately 24 inches in diameter, but Viking ultimately decided to construct a 42-inch trunk line to the river, in addition to several other storm lines. According to an engineer involved in developing Viking's storm water site plan, the City requested that Viking construct a larger trunk line to accommodate other potential future development within the basin. The engineer estimated that the larger trunk line was approximately twice as costly to construct as a 24-inch trunk line. Once constructed, Viking would dedicate the new outfall, trunk line, and one other storm water line to the City.

Viking estimated that storm water improvements associated with the project would cost over $2.8 million, and Viking argues it is spending $1.5 million to accommodate other, future properties in the basin. The City maintains, however, that Viking never proposed a private storm water system and that the City never required Viking to construct a public system rather than a private one.

## I. SYSTEM DEVELOPMENT CHARGES

System development charges are "'one-time charges paid by new development'" that are "a contribution of capital to either reimburse existing customers for the available system capacity, or to help finance future growth-related capacity improvements." Clerk's Papers (CP) at 1671 (emphasis omitted) (quoting Arthur C. Nelson, *System Development Charges for Water, Wastewater, and Stormwater Facilities* at 1 (Lewis Publishers, 1995)). They do not support current operations and maintenance or fund the costs associated with the "renewal and replacement" of existing infrastructure. CP at 1669. Rather, they are "used only for growth-related needs" and are "a form of 'system buy-in.'" CP at 1672, 1675. They are calculated at one point in time to reflect "the existing value of the available capacity of the system at the time." CP at 953.[1]

When the legislature adopted RCW 35.92.025, it authorized cities and towns to determine and impose reasonable system development charges on local property owners. In 2010, the City hired HDR Engineering Inc. to conduct a study that would help the City update its system development charge formula, "calculate cost-based charges for new customers," and provide "parity between existing and new utility customers." CP at 1667. The study explained that system development charges are "implemented according to the capacity requirement or impact each new development has on the utility system;" therefore, they are "related to the impact the customer places on the system, and to the benefit they derive from the service provided." *Id.*

Using a planning horizon of 2028, the City projected the "total impervious area" that would exist in the City in 2028 and divided that number by "the average impervious square footage of a

---

[1] System development charges are different from impact fees authorized under the Growth Management Act, chapter 36.70A RCW.

residential lot" to determine the total number of equivalent residential units, or equivalent service units, that would need to be serviced by the City's storm water system in 2028. CP at 1679. The study defined an equivalent service unit as "2,800 square feet of impervious area" and determined "the capacity needs" per equivalent service unit. CP at 1700. It considered "both existing plant assets, along with planned future improvements" in its system development charge calculation. CP at 1700-01. The future improvements included both "coordination/opportunity projects," which are "required to be completed along with other system utility projects such as street, water or sewer projects," and future capital improvement projects that will service new growth. CP at 1701. The allowable system development charge per equivalent service unit was then calculated based on these three components: the system's existing assets, coordination/opportunity projects, and future capital improvement projects.

To avoid paying for the same thing twice, a customer could be assessed a credit on their system development charge for debt service, meaning payments toward debt-financed infrastructure through the customer's monthly utility rates. The study did not contemplate any other form of credit. In 2016, the Puyallup City Council passed a new ordinance updating the City's system development charges based on this 2010 rate study.

## II. PROTEST TO THE CITY'S PUBLIC WORKS DIRECTOR

Between 2013 and 2018, Viking was repeatedly notified in correspondence from the City that it would eventually be responsible for a storm water system development charge. On July 25, 2018, the City notified Viking that its total storm water system development charge would be $997,280. This calculation was based on the 2010 rate study, the most recent budget adopted by the City, and the fact that Viking would be adding 887,600 square feet of impervious surface area,

or 317 equivalent service units, to the City. *See* Puyallup Municipal Code (PMC) 14.26.070. The charge was assessed as a condition of Viking's commercial building permit.

On August 8, 2018, Viking protested this charge to the City's public works director, Robert Andreotti, as permitted by local ordinance. *See* former PMC 14.26.080(1) (1999). Viking's protest letter stated that system development charges "must be reasonable and limited to an owner's equitable share of the cost of the system" and there "must be a nexus between the charge and the benefit derived by the customer." CP at 2390. Viking contended that it was building its own storm water system to "account for 100% of the runoff attributable to the property" and that the system would "discharge directly into the Puyallup River without any use of the City's system." *Id.* Therefore, Viking claimed it would neither benefit from the City's system nor "contribute to the problem of water runoff." *Id.* Accordingly, Viking argued there was "no basis" to assess a system development charge against it and, "[a]t a minimum," it was entitled to a credit based on the system improvements it was constructing. *Id.* Viking paid the development charge in full under protest.

Andreotti requested additional information from Viking, including the percentage of the storm water improvements that would be used by others and the cost of upsizing to accommodate use by others. He noted that although Viking contended it was not connecting to the City's system in a traditional sense, Viking would become "part of the City system and soon [be] physically connected [to] and impacting the system." CP at 2420. Additionally, Viking would be "using portions of this system associated with the transportation system to move trucks, employees and visitors to and from the site," which also has value. *Id.* Nevertheless, Andreotti agreed to consider the requested information to "establish an equitable fee." *Id.*

Viking responded that the City already possessed "much if not all" of the requested information in the property's storm plans and technical reports. CP at 2421. It asserted that it was "located downhill and at the very end of" the City's system, would be "entirely self-sufficient," and connected to the City's system "only to receive City water." *Id.* Because Viking did not provide additional information, the City hired a consultant to determine whether there was "a data driven reduction" that could be applied to the development charge. CP at 2425.

In May 2019, with the consultant's input, Andreotti reviewed the development charge and issued a final determination. He noted that Viking was not challenging the 2010 study, the resulting ordinance, or the basis for the development charge in general; it was challenging only the development charge as applied to "the specific and unique characteristics of the Viking development." CP at 466. He found that "Viking is a unique project that may (but is not required to) be granted an equitable adjustment." *Id.* However, he rejected the idea that an additional credit against the development charge would be warranted because "any 'overbuilding' or 'net addition' to the City's system," such as Viking's construction of a storm water system that would benefit other future development, could be addressed through a latecomer's agreement. *Id.*

Developers have an opportunity to recoup their costs for building storm water infrastructure through latecomer fees. Washington law provides for 20 years of pro rata reimbursement for the costs of constructing water or sewer facilities "from property owners who subsequently connect to or use the . . . facilities, but who did not contribute to the original cost of the facilities." RCW 35.91.020(2)(c). A "'latecomer's agreement'" is "an agreement between the city and a property owner for the sole purpose of reimbursing such owner for costs incurred by that owner for the installation of a public storm water drainage system," if the system has "a

7

reasonable possibility of directly benefiting future development by other properties within the area." PMC 21.10.130(1). The City's public works director is authorized to execute latecomer's agreements upon the property owner's request and the city council's approval. PMC 21.10.130(3). Viking has engaged in this latecomer process, seeking reimbursement if future development uses the infrastructure that Viking has built.

With regard to Viking's broader request for an equitable adjustment to its system development charge, Andreotti believed he had discretion to provide a credit "under certain conditions." CP at 471. He decided that a reduction of the portion of the system development charge that was based on the City's existing infrastructure would be reasonable in this case. He offered this equitable adjustment, reducing the total system development charge by approximately 39 percent to $571,234, but concluded, "This determination is contingent upon Viking accepting this equitable and discretionary adjustment as the final determination without further appeal or protest." CP at 474. If Viking did not accept this contingency, the offer of adjustment would be "automatically withdrawn." *Id.*

Viking did not accept this offer, so it assumed the approximately $997,000 development charge was still in effect and appealed this assessment. Although at the time, former PMC 14.26.080(3) (1999), specifically addressing protests of storm water system development charges, provided for appeal to the city council, the city council voted to refer Viking's appeal to the office of the hearing examiner.[2]

---

[2] PMC 14.26.080 was amended in 2019 and again in 2022. The provision providing for appeal of the director's determination to the city council now specifies that all system development charge appeals must be "to the Puyallup hearing examiner pursuant to the provisions of Chapter 2.54 PMC." PMC 14.26.080(3); *see* Puyallup Ordinance 3202, § 1 (Dec. 10, 2019). The City's attorney presented this amendment because "every other appeal of this type is designated by City Code to

III. HEARING EXAMINER REVIEW

A.     Open Record Hearing

The hearing examiner held an open record hearing in September 2019. At the hearing, Viking argued it was bringing this case because it believed its circumstances were "exceptional." CP at 860. "The reason that we're here is that this is a very unique property . . . at the very edge of the city limits . . . . at the very bottom of a hill." CP at 861. "It does not discharge any water to any stormwater systems," and "there are no City improvements within this basin," so "the whole notion of this being a connection to the City's system is really a misnomer." CP at 861-62. Viking argued the approximately $997,000 development charge was "both unreasonable and inequitable" under these circumstances. CP at 862.

The City rejected Viking's characterization of its circumstances as "exceptional" or particularly "unique" and argued, "[T]his is a project that is located in the City stormwater utility where a system development charge has been enacted by the City Council to apply evenly to all new development within the city. It is not unique in that regard." CP at 866-67. The City characterized its director's prior offer as an attempt to compromise and avoid further litigation and asserted its belief that the "fully calculated" system development charge was appropriate and lawful. CP at 867.

---

be heard by the City's Hearing Examiner," and the city council had "[r]ecently on several occasions . . . voted to refer appeals of Storm and Wastewater [System Development Charges] to the Puyallup Hearing Examiner." Puyallup City Council Agenda Item Report, City Council Regular Meeting Agenda, Dec. 10, 2019, at 117.

1.      Testimony and evidence presented at the hearing

Judith Dean, a senior financial analyst with HDR Engineering, testified for the City. Dean explained that a system development charge is "not based on usage but actually the capacity" of the storm water system overall. CP at 958. Dean testified that she believed system development charges led to equitable sharing of the system's costs because they were calculated based on the amount of impervious surface area the system as a whole could accommodate. The amount of impervious surface area that the new development would create and add to the system was the central question. A developer's construction of infrastructure that will be dedicated to the City is not typically a basis for awarding credit toward the system development charge.

A senior civil engineer for the City, Mark Higginson, reiterated that the system development charge is "calculated based on a city-wide rate," so "any applicant would be charged the similar rate based on the amount of impervious [surface] that they generate." CP at 996. "[W]hen a developer is building more than they absolutely need for their project," the costs may be made more equitable by the developer utilizing the latecomer's process. CP at 1013. The City does not address this issue by reducing the assessed development charges or providing a credit. Viking requested latecomer's agreements with the City addressing "a number of systems." *Id.* However, Higginson acknowledged that Viking may not recoup all of its costs through this process because the availability of reimbursement under a latecomer's agreement is time limited and depends on other developers connecting to the new infrastructure.

Director Andreotti also testified at the hearing and explained that he offered the adjusted development charge as "a good faith gesture" in an attempt "to avoid any future appeal of the process and then move on." CP at 1050. He clarified that the City was not obligated by law to

provide the 39 percent reduction. He explained that Viking's development was not unique and there were numerous sites whose storm water discharged directly into the river. "[T]here are other properties that are as unique." CP at 933.

Viking argued that its development was in a basin that did not collect storm water from other nearby basins, but there was conflicting testimony on this point. Andreotti was clear that the City's system collects upstream water before it gets to Viking's property and that the "[b]asins aren't isolated completely." CP at 924. Higginson agreed that each basin is "not in a bubble." CP at 1006. All properties benefit from flood prevention and "'protection of surface and groundwater quality and aquatic life.'" CP at 415.

Multiple witnesses testified that other aspects of the City's existing storm water system benefited Viking. For example, storm water systems are intimately connected with roadways because they must keep water off of the roads. The anticipated truck traffic to and from Viking's facility was estimated to be 250 trucks per day. The roadside ditches and gutters that exist throughout the entire City keep excess water from reaching Viking's property and potentially flooding it, and they allow Viking's trucks to access the property despite inclement weather. Additionally, when this truck traffic wears on the roads, it will impact the storm water system.

    2.    <u>Hearing examiner decision</u>

The hearing examiner deferred to the director's interpretation of former PMC 14.26.080(2) (1999) as allowing for an equitable adjustment to the system development charge. The hearing examiner reasoned that language in the municipal code allowing for a determination "'as to the correctness of the fee or charge' . . . appears to grant the Director the authority to provide an equitable adjustment." CP at 39 (quoting former PMC 14.26.080(2) (1999)). "Otherwise, it is

presumed the City Council would have simply stated that an adjustment is only possible if a mistake in the calculation of the [system development charge] assessment has occurred." *Id.*[3]

The hearing examiner concluded, however, that none of Viking's arguments "dictate[d] the conclusion that an equitable adjustment is required." *Id.* No law requires that a nexus be shown between the charge assessed and the *specific* benefit Viking will receive. And Viking will benefit from the City's system. Nevertheless, the hearing examiner recognized that Viking's storm water improvements would also benefit the City and concluded that "an equitable adjustment may be *warranted*," even if not legally required. CP at 42.

Ultimately, the hearing examiner concurred with the director's "reasoned assessment" and agreed that the 39 percent reduction was appropriate. *Id.* The hearing examiner assessed an adjusted development charge of $571,234. The hearing examiner disagreed, however, with the director's decision to make the adjusted charge contingent on Viking foregoing any further appeals. Viking then submitted a request for reconsideration, arguing it had new evidence that the City awarded a credit toward another developer's system development charge, but the hearing examiner denied the request.

B.    Closed Record Review

Both parties submitted petitions to the City's appellate hearing examiner.[4] Viking argued the hearing examiner erred in concluding that an individualized assessment and equitable

---

[3] The city council later added the following language to PMC 14.26.080(2): "The director's determination shall be limited to considering whether the fee is correctly calculated. Any adjustment proposed by the director for any other purpose must be approved by city council." Former PMC 14.26.080(2) (2019); Puyallup Ordinance 3202, § 1 (Dec. 10, 2019).

[4] Both parties also simultaneously filed LUPA petitions in superior court, as discussed below.

adjustment were not *required* and insisted it was entitled to a further reduction of its development charge. Viking's petition also asserted that it was not waiving any challenge to the validity of the City's two-tiered hearing examiner process by submitting its petition for appellate examiner review.

In its petition to the appellate examiner, the City argued that under former PMC 14.26.080 (1999), neither the director nor the hearing examiner possessed discretionary authority to make equitable adjustments to a system development charge. A reduction could only be granted if the development charge had been "incorrectly calculated." CP at 143.

The appellate examiner did not invite written responses from either party, nor did the appellate examiner hold oral argument. Based on a review of the closed record and the petitions, the appellate examiner reinstated the full amount of the originally assessed system development charge. The appellate examiner explained, "So long as the [system development charge] fee is applied uniformly based on the same criteria, that should be the equitable result called for." CP at 428. The applicable statutes "illustrate the fact that it is the city council that has the power and authority to adopt and enforce ordinances of all kinds relating to and regulating its local or municipal affairs and appropriate to the good government of the city, including ordinances regulating storm water." CP at 440. The examiner concluded, "Insofar as the 39% reduction in Viking's storm water [system development charge] rates is in conflict with the ordinance-approved rate," the hearing examiner's adoption of that reduction below the ordinance rate "is unsupported by substantial evidence in view of the entire record, and is in conflict with the City's adopted ordinance. Accordingly, it is in error and should be reversed." CP at 441.

The appellate examiner added, the section of municipal code providing for the director's review of system development charges says that the director may review "'*the correctness of the fee or charge*,'" and "the calculation of the storm and surface water [system development charges] is straight-forward and simple." *Id.* (quoting former PMC 14.26.080(2) (1999)). The appellate examiner concluded, "No discretionary authority to provide equitable adjustments[] exist[s] under city code or Washington State law, and it is not spelled out anywhere." CP at 442. Because there is no authority to grant equitable adjustments for system development charges, to do so "creates the risk of inconsistent, non-uniform and unfair results," which is "inconsistent with the goal of equality, consistency and uniformity of rates." *Id.* The appellate examiner also raised a concern that these discretionary adjustments could be construed as illegal gifts from the City.

The appellate examiner otherwise found substantial evidence supported the hearing examiner's findings and conclusions, rejecting Viking's arguments to the contrary.[5] The appellate examiner emphasized that Viking never challenged the 2010 report that provided the basis for the City's ordinance establishing storm water development charge rates. The appellate examiner determined the approximately $997,000 system development charge was appropriate and lawful.

IV. SUPERIOR COURT REVIEW

Viking's first LUPA petition—filed prior to review by the appellate examiner—challenged the initial hearing examiner's conclusion that an individualized assessment and equitable adjustment were not required and requested an adjusted system development charge of $0. Viking

---

[5] The appellate hearing examiner noted that there was conflicting evidence in the record as to whether Viking was actually required as a condition of its permit to build infrastructure serving the entire basin where the project is located. Some evidence suggested that Viking elected to upsize its trunk line for its own benefit. The appellate examiner did not make a finding resolving this conflicting evidence.

also challenged the hearing examiner's denial of its motion for reconsideration. The City's LUPA petition reiterated its arguments to the appellate examiner.

A.      Motion to Dismiss

The City filed a motion to dismiss Viking's first LUPA petition because Viking's closed record appeal with the appellate examiner had not yet taken place and, thus, there was no final land use decision from the City or exhaustion of administrative remedies. The City argued that, accordingly, Viking lacked standing and the superior court lacked jurisdiction under LUPA.

Viking responded that the "appellate examiner review process cannot lawfully form the basis of any exhaustion requirement" because it exceeds the limits imposed by RCW 35A.63.170, the state statute authorizing code cities to adopt hearing examiner systems. CP at 74. Acknowledging that the cases may not be ripe for review prior to the appellate examiner issuing a final decision, the superior court took the cases under advisement and deferred its decision on the City's motion to dismiss. After the appellate examiner issued its decision, the superior court denied the City's motion to dismiss for failure to exhaust administrative remedies as moot.

Viking filed another land use petition challenging the appellate examiner's decision that was consolidated with the already pending case. Viking maintained that the City's two-tiered hearing examiner process was contrary to state statute.

B.      Superior Court Ruling

After oral arguments at the LUPA hearing, the superior court issued an oral ruling. It recognized that the system development charge rates are intended to be applied throughout the entire City but considered Viking's development to be "sort of separate and apart from" the City. Verbatim Report of Proceedings (Sept. 29, 2020) at 57. It rejected Viking's argument that it should

15

not have to pay anything because it constructed additional infrastructure, and it also rejected the City's argument that the development charge should be applied in the same manner to Viking as it is applied to all developments. Ultimately, the superior court agreed with the original hearing examiner that the director has discretion to award equitable adjustments but not to condition them on foregoing a right to appeal. It explained "the goal of the statute" that allows cities to assess system development charges is to fairly allocate the total cost of the system and to require new developers "to actually pay what is a fair contribution to the cost of the entire system;" therefore, it was "reasonable to credit" Viking with the benefit it contributed to the system overall. *Id.* at 59-60. The superior court reinstated the reduced charge of approximately $571,000.

In its written ruling, the superior court rejected Viking's challenge to the City's two-tiered hearing examiner process and ruled that the City's hearing examiner system was not preempted by state law. The superior court denied Viking's challenge to the imposition of the system development charge, but it reversed the appellate examiner's imposition of the full charge and reinstated the reduced charge of $571,234.

Both parties appealed from this ruling. Viking appeals the superior court's denial of its challenge to the City's two-tiered hearing examiner system and denial of its claim that its system development charge "should be reduced below $571,234 or eliminated." CP at 2472. The City cross appeals the superior court's reversal of the appellate examiner's decision to impose the full $997,280 development charge.

ANALYSIS

I. STANDARDS OF REVIEW

LUPA governs judicial review of land use decisions. RCW 36.70C.010, .030(1); *Whatcom County Fire Dist. No. 21 v. Whatcom County*, 171 Wn.2d 421, 426, 256 P.3d 295 (2011). LUPA defines a "'[l]and use decision'" as "a final determination by a local jurisdiction's body or officer with the highest level of authority to make the determination, including those with authority to hear appeals." RCW 36.70C.020(2).

When a land use petition is before the superior court, the court will review the administrative record and "grant relief only if the party seeking relief has carried the burden of establishing that one of the standards set forth in [the statute] has been met." RCW 36.70C.130(1). The court may grant relief if the petitioner establishes that:

> (a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
> (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
> (c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court; [or]
> (d) The land use decision is a clearly erroneous application of the law to the facts.

RCW 36.70C.130(1)(a)-(d).

On appeal from the superior court, we "sit in the same position as the superior court and apply the standards set forth in RCW 36.70C.130(1) to the administrative record that was before the body responsible for the land use decision." *Whatcom County Fire Dist.*, 171 Wn.2d at 426. Whether the hearing examiner engaged in unlawful process or procedure under RCW 36.70C.130(1)(a) is a question of law that we review de novo. *Id.* We also review de novo whether

the land use decision was an erroneous interpretation of the law under RCW 36.70C.130(1)(b). *Westridge-Issaquah II*, 20 Wn. App. 2d at 355.

The hearing examiner's decision is supported by substantial evidence, as required by RCW 36.70C.130(1)(c), if there is "'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.'" *City of Univ. Place v. McGuire*, 144 Wn.2d 640, 647, 30 P.3d 453 (2001) (internal quotation marks omitted) (quoting *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998)). The hearing examiner erroneously applied the law to the facts, in violation of RCW 36.70C.130(1)(d), if "'although there is evidence to support [the challenged finding], the reviewing court on the record is left with the definite and firm conviction that a mistake has been committed.'" *Westridge-Issaquah II*, 20 Wn. App. 2d at 355 (quoting *Phoenix Dev., Inc. v. City of Woodinville*, 171 Wn.2d 820, 829, 256 P.3d 1150 (2011)). Regardless of which party prevailed in superior court, the party who filed the relevant petition has the burden of establishing an error under LUPA. *Quality Rock Prods., Inc. v. Thurston County*, 139 Wn. App. 125, 134, 159 P.3d 1 (2007).

## II. TWO-TIERED HEARING EXAMINER REVIEW

Because we review only the local jurisdiction's final determination when considering a LUPA petition, *see* RCW 36.70C.020(2), we must first address which hearing examiner's decision constitutes the local jurisdiction's final determination. Under the City's municipal code in effect at the time, if a customer was dissatisfied with the system development charge assessed, they could "file a written protest with the Public Works Director setting forth their objections." Former PMC 14.26.080(1) (1999). The director would then "make a determination in writing as to the correctness of the fee or charge." Former PMC 14.26.080(2) (1999). The former code provided,

"If the customer is dissatisfied with the decision, the customer may appeal to the City Council." Former PMC 14.26.080(3) (1999). Here, however, the city council voted to refer Viking's appeal to the office of the hearing examiner.

The City then implemented the hearing examiner process established in chapter 2.54 PMC. Chapter 2.54 PMC provides for an open record hearing by a hearing examiner, a written decision by the hearing examiner that includes findings and conclusions based on the record established, and a closed record review of the hearing examiner's decision by an appellate examiner. PMC 2.54.100, .110(1), .150, .170. The decision of the hearing examiner "shall be final subject to options for review and appeal available under PMC 2.54.150." PMC 2.54.110(3).

PMC 2.54.150 allows a party who feels that the hearing examiner's decision "contains substantial error, was materially affected by irregularities in procedure, is unsupported by substantial evidence in the record or is in conflict with the city's adopted plans, policies and ordinances" to request review by the appellate examiner. "The decision of the appellate examiner shall be final unless within 21 days of the decision of the appellate examiner a valid land use petition is filed with the Superior Court of Washington for Pierce County seeking judicial review of the action taken, pursuant to the requirements of state law." PMC 2.54.170.

A.    Delegation

Viking argues that "the appeal to the City Council of a hearing examiner's decision is not something that can be delegated under RCW 35A.63.170," the statute authorizing hearing examiner review. Resp. Br. of Viking JV, LLC as Appellant and Reply Br. of Viking as Cross Resp't at 29. But this seems to misunderstand what happened in this case. The city council

delegated review *of the director's decision* to the hearing examiner, and the hearing examiner's office then applied the process set forth in chapter 2.54 PMC.

As we explained in *Viking* I, No. 55421-6-II, slip op. at 7, at the recommendation of a governor's task force, the state legislature passed a comprehensive reform package in 1995 addressing local land use permitting and decision making. *See* LAWS OF 1995, ch. 347, § 401; S.B. REP. ON ENGROSSED SUBSTITUTE H.B. 1724, at 1, 54th Leg., Reg. Sess. (Wash. 1995). An increasing number of laws and regulations had complicated the process for obtaining land use permits. RCW 36.70B.010. And *Maranatha Mining, Inc. v. Pierce County* had highlighted some of the challenges of having elected council members make final land use decisions for local government. *See* 59 Wn. App. 795, 798-99, 801 P.2d 985 (1990) (describing a county council meeting and deliberations regarding a permitting decision).

In response, the legislature expanded the authority of local legislative bodies to "vest in a hearing examiner the power to hear and decide those issues [the local legislative body] believes should be reviewed and decided by a hearing examiner" to broadly include "[a]ppeals of administrative decisions or determinations." RCW 35A.63.170(1)(b); *see also* LAWS OF 1995, ch. 347, § 424.[6] This amendment to RCW 35A.63.170 reflected a legislative desire to provide local legislative bodies with delegation options, so that hearing examiners with expertise could decide land use project appeals for local jurisdictions, rather than the local legislative bodies. *See* RCW 35A.63.170(2)(c) (allowing local legislative bodies to give hearing examiner decisions "the effect of a final decision of the legislative body").

---

[6] This authority is "[i]n addition" to the municipality's statutory authority to adopt a hearing examiner system to address zoning ordinance amendments. RCW 35A.63.170(1).

Moreover, Viking's argument that RCW 35A.63.170 precludes this delegation is inconsistent with the broad police power authority granted to municipalities by the Washington Constitution and the legislature's clear desire not to restrict that broad police power when enacting title 35A RCW. *See* WASH. CONST. art. XI, § 11; RCW 35A.01.010, .63.160. Under title 35A RCW, "[t]he legislative body of each code city shall have power to organize and regulate its internal affairs . . . and to define the functions, powers, and duties of its officers." RCW 35A.11.020; *see also* RCW 35A.63.170(1) ("[T]he legislative body may vest in a hearing examiner the power to hear and decide those issues it believes should be reviewed and decided by a hearing examiner."). "The legislative body of each code city shall have all powers possible for a city or town to have under the Constitution of this state, and not specifically denied to code cities by law." RCW 35A.11.020.

Here, the city council, as the local legislative body, had the power to define the scope of its hearing officers' duties and to determine what issues should be decided by a hearing examiner. Nothing in RCW 35A.63.170 denies the city council the power to delegate its authority to decide a land use appeal to a hearing examiner.

B.      Preemption

Next, Viking argues that the City's two-tiered hearing examiner process, as codified in chapter 2.54 PMC, directly conflicts with RCW 35A.63.170. Accordingly, Viking submits that the initial hearing examiner decision is the reviewable land use decision under LUPA. We recently rejected Viking's nearly identical challenge to the City's two-tiered hearing examiner process in *Viking* I, No. 55421-6-II, slip op. at 16, and we follow that holding in this case.

21

As we explained in *Viking* I, we presume municipal ordinances are valid. *State v. Kirwin*, 165 Wn.2d 818, 825, 203 P.3d 1044 (2009). An ordinance is invalid only if it "directly conflicts with a state statute" or if the legislature preempted the field of regulation. *Id.* A local action or regulation "conflicts with state law where it permits what state law forbids or forbids what state law permits." *Id.* There is a conflict if the two provisions "cannot coexist." *Id.* at 826. "However, if the statute and ordinance may be read in harmony, no conflict will be found." *Watson v. City of Seattle*, 189 Wn.2d 149, 171, 401 P.3d 1 (2017).

Under RCW 35A.63.170(1), if the municipality chooses to vest power in a hearing examiner, "[t]he legislative body shall prescribe procedures to be followed by a hearing examiner." Additionally, the legislative body "shall by ordinance specify the legal effect of the decisions made by the examiner." RCW 35A.63.170(2). The legal effect of the hearing examiner's decisions "shall include one of the following:"

> (a) The decision may be given the effect of a recommendation to the legislative body;
> (b) The decision may be given the effect of an administrative decision appealable within a specified time limit to the legislative body; or
> (c) Except in the case of a rezone, the decision may be given the effect of a final decision of the legislative body.

RCW 35A.63.170(2)(a)-(c).

Consistent with RCW 35A.63.170(2)(c), the City has specified that each examiner's decision "may be given the effect of a final decision of the legislative body." The original hearing examiner's decision "shall be final *subject to options for review and appeal available under PMC 2.54.150.*" PMC 2.54.110(3) (emphasis added). And the appellate examiner's decision "shall be final *unless within 21 days of the decision of the appellate examiner a valid land use petition is filed*" in superior court. PMC 2.54.170 (emphasis added). There are no opportunities to appeal

22

from either administrative decision to a legislative body, and neither decision is a recommendation to the legislative body. Although the City's system has two tiers of review by the hearing examiner's office, it still relies on only one of the three options listed in RCW 35A.63.170(2), the option that allows a city to give a hearing examiner's decision the effect of a final decision by the city. *See Viking* I, No. 55421-6-II, slip op. at 14-15.

"Moreover, nothing in RCW 35A.63.170(2) expressly prohibits a two-tiered internal review system. Nor would implying such a restriction be consistent with our obligation to presume the validity of ordinances and to interpret provisions in chapter 35A.63 RCW liberally in favor of the municipality's self-governance." *Id.* at 15. The City's ordinance establishing a two-tiered hearing examiner system does not permit something that state law prohibits. *Id.*

In sum, we hold that nothing precluded the city council from delegating authority to hear a land use appeal to a hearing examiner, and we follow *Viking* I's holding that the City's two-tiered hearing examiner system is consistent with state law.

C.     Final Land Use Decision under LUPA

LUPA defines a "'[l]and use decision'" as "a final determination by a local jurisdiction's body *or officer* with the highest level of authority to make the determination, *including those with authority to hear appeals*." RCW 36.70C.020(2) (emphasis added). Under the version of the City's code in effect during this review process, the development charge determination could be appealed up to the city council. Former PMC 14.26.080(3) (1999). As expressly permitted by RCW 35A.63.170(1)(b), the city council then vested power to review this appeal of an administrative decision with its hearing examiner office, and the City applied the process established in chapter

23

2.54 PMC. Under chapter 2.54 PMC, the appellate examiner was the officer with the highest level of authority to review this determination for the City. *See* PMC 2.54.150, .170.

The appellate examiner's decision is therefore the reviewable land use decision under LUPA. *See* RCW 36.70C.020(2). We review the appellate examiner's decision to reinstate the full $997,280 system development charge and reject Viking's claim that the City "engaged in unlawful procedure or failed to follow a prescribed process" in violation of RCW 36.70C.130(1)(a).[7]

### III. AUTHORITY UNDER RCW 35.92.025

Viking argues the storm water system development charge that the City assessed is contrary to the plain language of RCW 35.92.025, which requires that a system development charge be "both 'reasonable' and 'equitable.'" Br. of Appellants Viking JV, LLC at 27. It suggests that applying the rates established for general application "may be insufficient and inconsistent with state law where unique circumstances exist." *Id.* at 29.[8] We disagree.

---

[7] In the facts section of its opening brief, Viking seems to criticize the closed record hearing process implemented here, complaining that the appellate examiner did not call for written responses or hold oral argument. But Viking does not make an express procedural due process argument in its brief or perform the *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), balancing test that a procedural due process argument would require. And neither party argues that the City failed to comply with RCW 36.70B.020(2)'s definition of a "closed record appeal."

Both parties were treated the same in this case. Both parties filed petitions seeking appellate examiner review of the hearing examiner's decision, neither party was invited to file a response, and neither party was invited to provide oral argument.

[8] The City's brief claims that it "adopts and hereby incorporates" a report, brief, and petition that it filed at earlier stages of the litigation "as part of this Brief and in support of arguments on appeal." Br. of Resp't/Cross Appellant City of Puyallup at 3 n.5. The Rules of Appellate Procedure do not allow for adoption and incorporation of prior filings in a brief. Parties should provide any "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record," within the appellate brief itself. RAP 10.3(a)(6); *see also* RAP 10.3(b).

A.      RCW 35.92.025 and Case Law Interpreting It

In relevant part, RCW 35.92.025 provides:

> Cities and towns are authorized to charge property owners seeking to connect to the water or sewerage system of the city or town as a condition to granting the right to so connect, in addition to the cost of such connection, *such reasonable connection charge* as the legislative body of the city or town shall determine proper *in order that such property owners shall bear their equitable share of the cost of such system.*

(Emphasis added.) By local ordinance, the City has required that "[e]ach new configuration of development within the city" must pay a system development charge that is "calculated by multiplying the [system development charge] rate . . . as specified in the most recent budget adopted by the city council by the number of [equivalent service units] associated with the property." PMC 14.26.070. Under PMC 14.26.070, one equivalent service unit is "equal to 2,800 square feet of hard surface area." *See also* PMC 14.01.010 (defining an "'[e]quivalent surface unit'" as "a configuration of development or hard surface on a parcel, estimated to contribute an amount of runoff to the city's storm and surface water drainage system which is approximately equal to that created by the average single-family residential parcel"). The ordinance also clarifies that the cost per equivalent service unit is "specified in the 2010 Water, Sewer, and Storm and Surface Water System Development Charges Study." PMC 14.26.070.

Washington courts have consistently held that "the fundamental basis on which the fee is to be calculated . . . is not that of the benefit received but merely an equitable sharing of the cost of *the system.*" *Boe v. City of Seattle*, 66 Wn.2d 152, 156, 401 P.2d 648 (1965) (emphasis added). Division One recently analyzed RCW 35.92.025 and held that it does not permit an "individualized challenge" to the reasonableness of such charges. *Westridge-Issaquah II*, 20 Wn. App. 2d at 365.

In *Westridge-Issaquah II*, as in this case, the developer challenged the assessment of connection charges against their particular property under RCW 35.92.025, but the developer did not argue that the ordinance or underlying rate study was invalid. *Id.* at 367-68. "Yet to successfully challenge [development charges] enacted pursuant to RCW 35.92.025, a party must adduce 'evidence disclos[ing] that the basis on which *the ordinance* establishes the fee is not the proper basis authorized by the statue.'" *Id.* at 368 (alteration in original) (internal quotation marks omitted) (quoting *Boe*, 66 Wn.2d at 155). Statutory language specifying that "'property *owners* shall bear *their* equitable share of the cost of' the city's utility system . . . contemplates the equitable share of property owners as a class, not what is equitable to charge an individual property owner based on that particular owner's impact on the city utility system." *Id.* (quoting RCW 35.92.025).

Division One explained that this interpretation of RCW 35.92.025 "is supported by the fact that 'adopting a fee ordinance for [connection charges] is a purely legislative function'" under the statute. *Id.* (alteration in original) (quoting *Palermo at Lakeland, LLC v. City of Bonney Lake*, 147 Wn. App. 64, 84, 193 P.3d 168 (2008)). Thus, a developer cannot challenge the charges established under RCW 35.92.025 "solely as they apply to its particular properties." *Id.* at 369. Further, if a party shows the connection charges enacted are unreasonable, the remedy is to invalidate the enacting ordinance, "not to simply invalidate the charges as they apply to an individual property." *Id.* (citing *Boe*, 66 Wn.2d at 156, and *Palermo*, 147 Wn. App. at 68-69, as examples of courts invalidating local ordinances upon a showing that the charges they enacted were unreasonable or arbitrary).

In contrast, in other circumstances, the legislature has required that costs assessed by a city be proportionate to the costs actually attributable to each specific property. Charges assessed under RCW 82.02.020, for example, may not "exceed the proportionate share of such utility or system's capital costs which the county, city, or town can demonstrate are *attributable to the property being charged*." (Emphasis added.) But this statute is separate from and does not limit a city's authority to impose connection charges under RCW 35.92.025 because RCW 35.92.025 preexisted RCW 82.02.020, and the legislature specifically stated that preexisting authority would be unaffected by the adoption of RCW 82.02.020.[9] *See Westridge-Issaquah II*, 20 Wn. App. 2d at 370. There is no comparable proportionality requirement in the language of RCW 35.92.025, and "we will not add language to a clear statute." *Wash. State Coal. for the Homeless v. Dep't of Soc. & Health Servs.*, 133 Wn.2d 894, 904, 949 P.2d 1291 (1997). Besides pointing to the word "equitable" in the statute, which qualifies the phrase "share of the cost of such *system*," Viking points to no legal basis for the idea that RCW 35.92.025 may require cities to provide individualized equitable adjustments in some circumstances. RCW 35.92.025 (emphasis added).

The legislature has also specifically allowed for credits based on the installation of infrastructure improvements in other situations. When a city "imposes rates or charges to fund stormwater control facilities or improvements and the operation and maintenance of such facilities

---

[9] In full, this paragraph of RCW 82.02.020 provides:

> Nothing in this section prohibits counties, cities, or towns from imposing or permits counties, cities, or towns to impose water, sewer, natural gas, drainage utility, and drainage system charges. However, no such charge shall exceed the proportionate share of such utility or system's capital costs which the county, city, or town can demonstrate are attributable to the property being charged. *Furthermore, these provisions may not be interpreted to expand or contract any existing authority of counties, cities, or towns to impose such charges.*

(Emphasis added.)

or improvements under RCW 35.67.020, 35.92.020, 36.89.080, 36.94.140, 57.08.005, or 57.08.081, it may provide a credit for the value of stormwater control facilities or improvements" that the entity has installed to "mitigate or lessen the impact of stormwater which otherwise would occur." RCW 90.03.510. For example, a developer may be entitled to a reduction in their storm water utility rate if they install a rainwater harvesting system. RCW 36.89.080(2). But the legislature did not include RCW 35.92.025 in the list of statutes eligible for such a reduction, nor did the legislature include comparable credit language in RCW 35.92.025, so it appears the legislature did not intend for system development charges to be eligible for improvement-based credits.

Viking relies primarily on *Teter v. Clark County*, 104 Wn.2d 227, 704 P.2d 1171 (1985), arguing that in *Teter*, the Supreme Court held it was reasonable to charge property owners for water management services because evidence showed they actually contributed surface water runoff to the basin. But *Teter* applied chapter 36.89 RCW, addressing a county's police power to operate storm water management systems to protect the public from storm water damage, not RCW 35.92.025. *See* 104 Wn.2d at 232. Moreover, the Supreme Court clarified in *Teter* that judicial review of a legislative decision "is limited to determining whether the ordinances and resolutions passed . . . are arbitrary or capricious," so the court did "not undertake to ascertain whether appellants' properties actually contribute[d] to increased surface water runoff" by reviewing affidavits about surface water contributions that were signed several years after the ordinance was passed. *Id.* at 236. Clark County enacted an ordinance imposing charges on all property owners within a specific drainage basin, and the court rejected an argument that the county acted arbitrarily merely because it "did not individualize each rate." *Id.* at 238 (emphasis omitted).

28

Viking also relied on *Hillis Homes, Inc. v. Public Utility District No. 1 of Snohomish County*, 105 Wn.2d 288, 714 P.2d 1163 (1986), in some of its protests and appeals. *See* CP at 1635, 1655 (citing *Hillis Homes*, 105 Wn.2d at 300, for the proposition that "[w]hile connection charges are presumptively reasonable, they will not be upheld if it appears that they are excessive and disproportionate to the services rendered"). Again, this case did not apply RCW 35.92.025. And in it, the Supreme Court rejected the argument that the assessed general facilities charge was "discriminatory and unreasonable because it was allegedly calculated without regard to the benefits received by the various customers." *Hillis Homes*, 105 Wn.2d at 300. The court explained that different classes of customers, such as new single-family, multi-family, and commercial/industrial customers, "may be charged different rates as long as the classifications themselves are reasonable." *Id.* at 301. The utility district was not required to individualize the charges "according to the benefits accruing to each specific customer." *Id.*

Whether Viking's construction of new infrastructure is a benefit to the City that it should have received some sort of compensation for is an individualized inquiry and a separate question from the appropriateness of assessing a system development charge on their property according to the generally applicable rate. The City's rate formula was developed for general application based on the cost of the entire storm water system, and this approach to assessing system development charges is consistent with the authorizing statute. Viking has not challenged the City's formula, the study supporting it, or the ordinance adopting it, as *Westridge-Issaquah II* requires. Nor has Viking claimed that the City miscalculated its charge under the adopted formula. If Viking wanted to obtain some reciprocal benefit for its construction of storm water infrastructure, it could have negotiated that benefit directly with the City through development contracts. *See* CP at 434

29

(appellate examiner finding no error in the hearing examiner's suggestion that Viking could have signed a contract with the City to receive some "'offset'" for its contribution of infrastructure). Moreover, it appears from the record that Viking has pursued latecomer's agreements, which is the established mechanism for recouping some of the costs of building infrastructure that will benefit future development.

We therefore reject Viking's challenge to the appellate examiner's decision to reimpose the original system development charge of $997,280. Under a correct interpretation of RCW 35.92.025, it was proper to impose a system development charge calculated according to the terms of the City's municipal code. No individualized assessment or equitable adjustment was permitted by state law.

Nor was it permitted by the City's code. The public works director calculated a reduced charge, but the City's code only authorized him to review the assessed development charge and "make a determination in writing as to the correctness of the . . . charge." Former PMC 14.26.080(2) (1999). In other sections of the municipal code, the City expressly authorizes the director to exercise his reasonable discretion. For example, when determining the appropriate reimbursement charge under a latecomer's agreement, the code provides that the charge "shall be based on the total project cost and figured on either a front-foot or area assessment basis or both *at the reasonable discretion of the public works director*." PMC 21.10.130(2) (emphasis added). PMC 14.26.080(2) did not similarly authorize use of "reasonable discretion." When read in conjunction with RCW 35.92.025 and contrasted with other provisions of the municipal code, it is clear that the director's role in determining "the correctness" of a charge was limited to verifying

the underlying calculations and project details that informed the charge, such as the square feet of impervious surface that would be added to the City's storm water system.

In sum, we see no reason to depart from Division One's analysis in *Westridge-Issaquah II* when reviewing charges assessed under RCW 35.92.025. We follow *Westridge-Issaquah II* and reject Viking's individualized challenge to its system development charge as impermissible under RCW 35.92.025. Washington law does not require an equitable adjustment based on the Viking project's specific characteristics or infrastructure contributions. Because the amount of impervious surface area that Viking is adding to the City is uncontested, the system development charge calculated based on that amount of surface area is supported by substantial evidence. Applying RCW 35.92.025 and the City's municipal code to these facts, the appellate examiner's decision was not clearly erroneous.

B.      The Record Supports the Conclusion that Viking Does Benefit from the Rest of the City's Storm Water Infrastructure

According to Viking, its property is unique, warranting a credit or adjustment to its system development charge, because its project will neither benefit from nor burden the City's existing or future storm water infrastructure. Even if we were to reach this argument, we would conclude that there is substantial evidence in the record to support the appellate examiner's conclusion that Viking benefits from the City's storm water system.

Multiple witnesses testified that the City's existing storm water system benefited Viking by keeping excess water from reaching Viking's property and potentially flooding it. The public works director testified that basins are not isolated, and a senior civil engineer testified that each basin is "not in a bubble." CP at 1006. Thus, Viking's property was not uniquely separated from the rest of the City's storm water infrastructure such that the City's other infrastructure would not

benefit Viking at all. Viking estimated 250 trucks would travel to and from its facility every day, and the City's storm water system will maintain open roadways in inclement weather. In addition, there was testimony that *all* properties within a storm water system benefit in other ways, for example, from "'protection of surface and groundwater quality and aquatic life.'" CP at 415. There was "'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness'" of the conclusion that Viking's property is not particularly unique or completely isolated and will reap benefits from the City's storm water infrastructure. *City of Univ. Place*, 144 Wn.2d at 647 (internal quotation marks omitted) (quoting *City of Redmond*, 136 Wn.2d at 46).

Viking has not shown that it is unreasonable to charge property owners a system development charge based on the value of the City's storm water infrastructure, its total storm water system capacity, and the amount of impervious surface area that the property owner is adding to the City's system. Because Viking is adding impervious surface to the City, a system development charge was warranted by law and compliant with RCW 35.92.025. Thus, the appellate examiner's ruling on this point did not violate RCW 36.70C.130(1)(b)-(d). Viking has not met its burden to establish a "'definite and firm conviction that a mistake has been committed'" in applying RCW 35.92.025 to the facts of this case. *Westridge-Issaquah II*, 20 Wn. App. 2d at 355 (quoting *Phoenix Dev.*, 171 Wn.2d at 829).[10]

---

[10] In its opening brief, Viking also cites to several cases involving takings law. *See* Br. of Appellants Viking JV, LLC at 30, 30 n.59 (citing *Dolan v. City of Tigard*, 512 U.S. 374, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987); *Burton v. Clark County*, 91 Wn. App. 505, 958 P.2d 343 (1998)). However, Viking does not actually argue that the City's imposition of the system development charge was an illegal taking. Nor could it because Viking did not bring a constitutional takings challenge in its petitions below. *See* CP at 1-15 (first LUPA petition), 99-105 (petition for appellate

We uphold the appellate examiner's decision and hold that Viking fails to establish an error under LUPA. Accordingly, we affirm the superior court's validation of the City's two-tiered hearing examiner system, reverse the superior court's imposition of the reduced system development charge, and remand for imposition of the full, correctly calculated system development charge.

## CONCLUSION

We follow our recent holding in *Viking* I that the City's two-tiered hearing examiner process is valid and, accordingly, we review the appellate examiner's decision as the final land use decision under LUPA. We hold the system development charge assessed by the City was proper under RCW 35.92.025 and that statute does not permit Viking to bring an individualized challenge to the charge. We therefore affirm the superior court's validation of the City's two-tiered hearing examiner system, reverse the superior court's imposition of the reduced system development charge, and remand for imposition of the full, $997,280 system development charge, upholding the appellate examiner's decision.

---

examiner review), 390-405 (second LUPA petition), 1633-40 (appeal to hearing examiner), 2390-93 (protest to public works director).

No. 55371-6-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Glasgow, C.J.

We concur:

_____
Veljacic, J.

_____
Price, J.

34